**Dominic MURRAY, Plaintiff,**

v.

**BRITISH BROADCASTING CORP., et al., Defendants.**

No. 94 Civ. 6162 (LLS).

United States District Court,
S.D. New York.

April 3, 1995.

Herzfeld & Rubin (John M. Schwartz, of counsel), New York City, for Plaintiff.

Weiss Dawid Fross Zelnick & Lehrman (Roger L. Zissu, of counsel), New York City, for Defendants.

## Memorandum and Order

STANTON, District Judge.

Plaintiff Dominic Murray sues the British Broadcasting Corporation ("the BBC"), a corporation organized under the laws of the United Kingdom, and BBC Lionheart Television International ("Lionheart"), a Delaware corporation and wholly-owned subsidiary of the BBC, alleging copyright infringement, false designation of origin and state law unfair competition. Murray claims the BBC is licensing rights in a character whose costume Murray designed and copyrighted. He asserts copyright infringement claims under both United States and English law.

Defendants now move to dismiss the complaint on the ground of *forum non conveniens*.

### BACKGROUND

Murray is a self-employed costume and props designer and maker who lives in England. In July 1992, the BBC engaged Murray to produce a costume for a character named Mr. Blobby, who was scheduled to appear on the BBC television show "Noel's House Party." (Declaration of Dominic Murray dated November 14, 1994, ¶ 2) [hereinafter "Murray 11/94"]

The parties disagree on the process by which the Mr. Blobby costume was designed and constructed. According to Murray, he provided the bulk of the creative input. After he accepted the commission, he and Venetia Ercolani, a BBC costume designer, met to discuss the costume. Ercolani told Murray that the producer of Noel's House Party wanted a "silly-looking pear-shaped costume" but did not bring any sketches to the meeting. (*Id.* ¶ 14.) Ercolani and Murray "scribbled" as they discussed the details of the costume. (*Id.* ¶ 16.) Murray retained the scribbles until the costume was approved by the BBC but denied using them in the course of his work. (*Id.* ¶ 17.)

According to Murray, he was "left with almost total design freedom" even after the meeting with Ercolani. (*Id.* ¶ 20.) Ercolani supplied basic requirements (*e.g.,* that the costume be pink and shiny), while Murray suggested important changes and refinements. (*Id.* ¶ 18–19.) The "only suggestion[s Murray] can remember being made by Ms. Ercollani [sic] rather than by [him] at this stage" were that the costume's head flip back and that it have eyelashes. (*Id.* ¶ 23.) "Almost all of the suggestions," Murray claims, were made by him. (*Id.* ¶ 25.)

After Murray "had already made the bulk of" the costume's body, Ercolani sent him a sketch showing "very little detail." The sketch "became the subject of jokes and mirth" in Murray's studio because it was so "unsuitable." Eventually, one of Murray's assistants used it for scrap paper, took it home and disposed of it. (*Id.* ¶¶ 32–34.)

According to Ercolani, Murray did not design the costume, but merely constructed it to the BBC's specifications, which were formulated before Murray was commissioned. Guy Freeman, the production manager for "Noel's House Party," asked Ercolani to design and construct a costume for Mr. Blobby. Freeman told her that Mr. Blobby would wear a "pear shaped costume with psychedelic colors." (Declaration of Venetia Anne Ercolani ¶ 4.)

Ercolani then engaged Murray to construct the costume. (*Id.* ¶ 6.) Before meeting with Murray, Ercolani met with Freeman and producer Mike Leggo to discuss the costume. (*Id.* ¶ 7.) They decided the cos-

tume should be shaped like a pear, made of pink shiny and rubbery fabric, covered with yellow round spots, and adorned with a bow tie. They also talked about the design of the hands, feet, eyes, lashes, and eyelids. (*Id.* ¶ 8.) After the meeting, Ercolani made notes and several colored drawings of the costume in her notebook. (*Id.* ¶ 10.)

Shortly after the meeting with Freeman and Leggo, Ercolani met with Murray. She gave him a detailed design drawing,[1] which he retained. (*Id.* ¶¶ 12–13.) Murray and Ercolani discussed the costume in great detail, (*id.* ¶ 16) and talked on the phone several times to go over "further characteristics." (*Id.* ¶ 17.) Murray constructed the costume in accordance with Ercolani's instructions and delivered it on July 23, 1994. (*Id.* 18.)

Although Murray cannot recall with certainty whether he received a purchase order from the BBC for the Mr. Blobby costume, he did not mark the purchase order number on the invoice he sent to the BBC, which was his usual practice when he received a purchase order. He cannot locate a copy of the purchase order in his files. (Murray 11/94 ¶ 22.)

The BBC's files, however, contain a copy of the purchase order pursuant to which it commissioned Murray to make the Mr. Blobby costume. The original purchase order, according to the BBC's head of litigation, would have been sent to Murray. (Declaration of Diana Adie dated December 12, 1994, ¶ 7) [hereinafter "Adie 12/12"] The purchase order contains a brief description of the work to be completed: "To make a children's monster 'Mr. Blobby' pear shaped dome shaped head with mechanical workings for mouth [unreadable] top head and two sets of sleeves." The purchase order provides that the costume should be "painted pink with yellow spots." The conditions of order, which appear on the back of the purchase order, provide that the purchase order "shall operate and be construed in accordance with English law." (Defendants' Exh. P.)

Mr. Blobby became popular, and the BBC began licensing rights in it in England. (Af-

fidavit of Michael Gury dated October 11, 1994, ¶ 5.) In June 1994, the BBC presented Mr. Blobby at the International Licensing and Merchandising Conference and Exposition in New York City. (Declaration of Paul A. Walsh ¶ 8.) Lionheart, which distributes rights originating in the BBC's programs, is still negotiating to license the rights to market Mr. Blobby in the United States and has not yet done so. (Gury Aff. ¶¶ 4, 6.)

## DISCUSSION

■ The doctrine of *forum non conveniens* permits a court to "resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute," *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 506, 67 S.Ct. 839, 842, 91 L.Ed. 1055 (1947), if dismissal would "best serve the convenience of the parties and the ends of justice." *Koster v. Lumbermens Mut. Cas. Co.,* 330 U.S. 518, 527, 67 S.Ct. 828, 833, 91 L.Ed. 1067 (1947).

### A. *Available Alternative Forum*

■ In deciding a motion to dismiss on the ground of *forum non conveniens,* a court must first determine whether an alternative forum is available. *Gilbert,* 330 U.S. at 507, 67 S.Ct. at 842. Defendants argue that England is an available alternative forum because the BBC is subject to process in England and Lionheart would consent to jurisdiction. According to Murray, a potential bond requirement and his inability to retain an attorney in England on a contingent-fee basis make England unavailable.

■ The requirement of an alternative forum is ordinarily satisfied if the defendant is amenable to process in the other jurisdiction, except "in rare circumstances" when "the remedy offered by the other forum is clearly unsatisfactory." *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 254 n. 22, 102 S.Ct. 252, 265 n. 22, 70 L.Ed.2d 419 (1981). For example, a forum is inadequate if it does not permit litigation of the subject matter of the dispute. *Id.*

---

1. The show's prop buyer and graphic designer also received copies of the design drawing. (Er-

colani Dec. ¶ 20.)

■ Courts are divided on whether financial hardships facing the plaintiff in an alternative forum, such as the absence of a contingent-fee system, render that forum inadequate. *Compare Coakes v. Arabian American Oil Co.*, 831 F.2d 572, 575 (5th Cir.1987) (plaintiff citing illegality of contingent-fee system "cannot actually argue that England is not an available, alternate forum" because defendant is amenable to process there); *Lehman v. Humphrey Cayman, Ltd.*, 713 F.2d 339, 346 (8th Cir.1983), *cert. denied*, 464 U.S. 1042, 104 S.Ct. 708, 79 L.Ed.2d 172 (1984); *Rudetsky v. O'Dowd*, 660 F.Supp. 341, 346 (E.D.N.Y.1987) *with McKrell v. Penta Hotels*, 703 F.Supp. 13, 14 (S.D.N.Y. 1989) (denying motion to reject magistrate's report which concluded that alternative forum was not available because it had no contingent-fee system). The majority of courts consider the plaintiff's financial hardships as part of the private interest inquiry. Under that approach, England is an available alternative forum.

### B. *Gilbert Factors*

Once the court has identified an alternative forum, it must balance the private interest and public interest factors to determine whether the convenience of the parties and the ends of justice would best be served by dismissing the action. *See Gilbert*, 330 U.S. at 508–09, 67 S.Ct. at 843.

#### 1. Effect of the Berne Convention

■ Generally, a foreign plaintiff's choice of forum is entitled to less deference than that of a domestic plaintiff. *Piper Aircraft*, 454 U.S. at 256, 102 S.Ct. at 266. Murray argues that his choice is entitled to the deference accorded the choice of a domestic plaintiff because the Berne Convention, a copyright treaty to which both the United Kingdom and United States are parties, alters the *forum non conveniens* inquiry in copyright cases. He contends that the cases relied upon by defendants, which were decided before the United States acceded to the Berne Convention in 1989, ignore the principle of national treatment embodied in the Berne Convention.[2]

Murray argues, relying on *Irish National Insurance Co. v. Aer Lingus Teoranta*, 739 F.2d 90 (2nd Cir.1984), that the principle of national treatment increases the deference due a foreign copyright plaintiff's choice of forum. In *Aer Lingus*, the court held that the forum choice of an Irish plaintiff which sued an Irish defendant in a United States court was entitled to the same deference as a domestic plaintiff because a treaty between the U.S. and Ireland gave the plaintiff " 'national treatment with respect to ... having access to the courts of justice ..., both in pursuit and in defense of [its] rights.' " *Id.* at 91–92 (quoting Treaty of Friendship, Commerce and Navigation, January 21, 1950, United States–Ireland, art. VI(1)(c), 1 U.S.T. 785, 790–91, T.I.A.S. No. 2155, at 8).

■ Murray's reliance on national treatment is misplaced. National treatment ensures that the substantive law of the country in which infringement is alleged will govern a claim, even if the law of that country differs from the law of the country in which the work was created. *London Film Productions Ltd. v. Intercontinental Communications, Inc.*, 580 F.Supp. 47, 50 n. 6 (S.D.N.Y. 1984).

Nor does *Aer Lingus* require greater deference to Murray's choice of forum. Whereas the treaty at issue in *Aer Lingus* specifically provided for national treatment in access to the courts, the Berne Convention makes no mention of such access. Murray has not pointed to any other treaty or agreement between the United States and the United Kingdom granting national treatment with respect to access to the courts. Thus, the general rule applies and Murray's choice of forum receives less deference than that of a domestic plaintiff.

**2.** Because the Universal Copyright Convention, to which the United States has been a party since 1955, requires national treatment, Murray errs in asserting that *forum non conveniens* cases decided before the United States acceded to the Berne Convention do not take into account the principle of national treatment. *See London Film Productions Ltd. v. Intercontinental Communications, Inc.*, 580 F.Supp. 47, 50 n. 5 (S.D.N.Y. 1984) (Under both the Universal Copyright Convention and the Berne Convention, an author "is entitled to the same copyright protection in each other member state as such other state accords its own nationals.").

## 2. Private Interest Factors

██ The private interests a court should consider in deciding whether the balance of convenience mandates dismissal include "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive," as well as the enforceability of a judgment if one is obtained. *Gilbert,* 330 U.S. at 508, 67 S.Ct. at 843. The financial hardship a plaintiff will suffer in prosecuting the action in the alternative forum should also be considered in balancing the private interests.

### a. Location of proof

██ Defendants contend that dismissal is appropriate because all of the documentary and physical evidence is located in England. They argue that transporting the evidence from England to the United States would be difficult and expensive and that it would be impossible to compel production of evidence under the control of third parties located in England if the case is tried in the United States.

With the exception of the original Mr. Blobby costume, which is in New York, (*see* Murray 11/94, ¶ 12(a)), all of the physical and documentary evidence is in England. It would not be overly burdensome for the defendants to transport that evidence, which consists of a modest number of documents, notebooks, drawings, costumes, and props, to the United States. However, *defendants* might be unable to compel third parties located in England to produce documents— specifically, telephone records and documents evidencing Murray's course of dealings with customers other than the BBC (*see* Adie 12/12 ¶ 23)—for a trial in the United States. Murray has not identified any evidence which would be inconvenient for him to transport to or obtain for a trial in England. Accordingly, the location of the evidence weighs in favor of dismissal.

### b. Availability of compulsory process and cost of attendance

Defendants claim they will need to call numerous witnesses, all but one of whom reside in England. Those witnesses, defendants assert, are not subject to process issued by a United States court[3] and would be costly to bring to the United States. Murray questions the relevance of most of the witnesses' testimony. The parties' disagreement stems in large part from their divergent theories of the case.

Murray claims he owns the copyright in the Mr. Blobby costume because he is the author of the costume and has not assigned or licensed the copyright. (Amended Complaint ¶¶ 29–30.) Defendants, Murray alleges, are infringing his copyright by licensing merchandise which uses or depicts the costume without his consent. (*Id.* ¶¶ 34–37, 47–50.) Because a transfer or assignment of a copyright must be in writing and because there is no such writing assigning rights in the costume, the BBC has no interest in the copyright. (Plaintiff's Memorandum, at 25.) Murray asserts he will need to call few witnesses and introduce little physical or documentary evidence.

Defendants attack Murray's claim on several fronts. They assert that under English law the costume is not a "work of artistic craftsmanship," as Murray claims, but rather a "design right," which is owned by the person (here the BBC) who commissioned the work. They claim that Murray is not the costume's author because he merely constructed the costume in accordance with the BBC's instructions. Defendants also contend that the BBC equitably owns the copyright. Finally, they claim that even if Murray owns the copyright, under English and American law he granted the BBC an implied license to use the costume. Defendants argue that, contrary to Murray's assertion, a writing is not needed to gain equitable title to a copyright or to grant an implied license.

██ Each of defendants' theories requires them to call several witnesses. For example, to determine equitable ownership of copyright, a court considers all the circum-

---

**3.** Defendants concede that process will not be necessary to compel the attendance of witnesses who are employed by the BBC at the time of trial.

stances surrounding the work's creation, including the contract (if any) between the parties, the parties' intentions and course of dealings, and trade custom or practice. Thus, defendants urge, they will need to call the BBC employees who worked on the costume, the producers of other programs for which Murray made costumes, and other persons qualified to testify regarding industry custom. All of those witnesses live in England.

To rebut Murray's claim that he owns the copyright because he designed the costume, defendants plan to call "Noel's House Party" personnel and the assistants who worked in Murray's studio. Those assistants, who live in England, will testify as to whether they and Murray worked from a sketch, and if they did, how much detail the sketch contained. Because Murray and an assistant threw away the sketches made during the design process, testimony describing those sketches is critical to establishing the relative creative contributions of Murray and the BBC staff.

On the basis of the affidavits submitted by Murray and defendants, it appears that defendants may have several defenses which appear unimpaired by Murray's not assigning the copyright in writing. The witnesses whose testimony is relevant to those defenses all reside in England, where the non-party witnesses are not subject to a American court's subpoena power. Murray has pointed to only a few American witnesses, who will testify regarding U.S. infringement and possibly damages, whose testimony he would be unable to compel in England.

In addition, the cost to defendants of bringing all of their witnesses to the United States, and the inconvenience to defendants and the witnesses, militates in favor of dismissal. Although deposition testimony could be used in place of the live testimony of some of the witnesses (such as those testifying regarding chain of custody issues) live presentation will be crucial to allow the jury to evaluate the credibility of witnesses whose testimony conflicts. On balance, the location of the witnesses strongly favors dismissal.

#### c. *Other practical problems*

Murray claims he cannot afford to sue in England, where contingent-fee arrangements are prohibited, because he does not have the means to pay his lawyer. He states, however, that his annual income places him above the threshold for qualifying for legal aid in England. (Declaration of Dominic Murray dated January 25, 1995, ¶ 9.)

Murray estimates that he will incur legal fees, if his case goes to trial, of at least £100,000–150,000. (*Id.* ¶ 10.) He reports total pre-tax personal income, after business expenses, of £46,066 for the year ended October 31, 1992, and £57,515 for the year ended October 31, 1993. He estimates his 1994 pre-tax income at about £45,000. (*Id.* ¶ 5.) He owns an apartment in London valued at £110,000, which secures total mortgage indebtedness of £100,885 (*id.* ¶ 6.) and an automobile on which he must make payments for one more year. (*Id.* ¶ 7.)

The information Murray has provided suggests that although he does not have liquid assets sufficient to cover the expenses he expects to incur litigating in England, he is not of such limited means that the English prohibition on contingent-fee arrangements would prevent him from pursuing his claim. He owns a profitable business, a home and an automobile. He is credit-worthy,[4] as evidenced by the loans he obtained to purchase and renovate his apartment and to purchase his automobile.

When a court denies a *forum non conveniens* motion because the plaintiff can not afford to litigate in the alternative forum, the plaintiff generally has a much lower income and fewer assets than Murray. For example, in *McKrell v. Penta Hotels (France)*, 703 F.Supp. 13, 13 (S.D.N.Y.1989), the court held that the alternative forum was not available because the plaintiff lacked the financial ability to litigate there: she owed $10,000 in medical bills which she was unable to pay, that her health insurance would expire soon, and that she had assets of under $50. Similarly, in *Fiorenza v. United States Steel Int'l*, 311 F.Supp. 117 (S.D.N.Y.1969), the court

---

**4.** Defendants have waived their right, which may arise when a plaintiff secures a loan with a future recovery, to ask the English court to re-

quire Murray to post a bond for their costs. (*See* Adie 12/12 ¶ 6.)

denied a *forum non conveniens* motion because, among other reasons, the alternative forum prohibited contingent-fee arrangements and the plaintiff could not pre-pay a retainer. The plaintiff had no source of income, had been unable to work since the accident over which he sued, and was living with his brother, who supported him. *Id.* at 120.

The difficulties Murray may encounter in litigating in England are not sufficiently severe to alter the private interest conclusion. Because nearly all of the prospective witnesses and physical and documentary evidence are located in England, the private interest factors strongly favor dismissal. *See Blanco v. Banco Industrial de Venezuela,* 997 F.2d 974, 982 (2nd Cir.1993) (private interest factors strongly favor dismissal when most witnesses and physical and documentary evidence are located in other forum).

### 3. Public Interest Factors

■ Public interest factors relevant to the *forum non conveniens* determination include court congestion, the local interest in having localized controversies decided at home, the unfairness of imposing the burden of jury service on citizens in a forum unrelated to the dispute, and the appropriateness of trying a case in a forum which is familiar with the law to be applied. *Gilbert,* 330 U.S. at 508–09, 67 S.Ct. at 843. Because neither party has discussed the relative congestion of the American and English courts, that factor does not affect the inquiry.

#### a. *Relationship of the litigation to the forum*

■ Defendants claim that English courts have the primary interest in resolving the case because both the BBC and Murray are citizens of England and because the events giving rise to the litigation—with the exception of the incipient infringement in the United States—occurred in England. Defendants also contend that considerations of comity dictate that a citizen of England should not be allowed to haul the BBC, a taxpayer-funded entity, into court in the United States.

Murray argues that the United States has two interests in the litigation: an interest in

enforcing its laws and an interest in preventing the inefficiency which would result from dismissal of this case. According to Murray, if Lionheart licenses Mr. Blobby in the United States, each licensee will be an infringer of Murray's copyright. If this case is dismissed, Murray will be forced to bring suit in the United States against each licensee, giving rise to duplicative litigation.

The United States and England do have an interest in ensuring compliance with their laws. *See London Film Productions,* 580 F.Supp. at 49. However, those interests are somewhat weakened by the fact that whether an English or American court hears the case, it will apply the law of the country of the alleged infringement.

■ The citizenship of the parties gives England a greater interest in the litigation. Both Murray and the BBC are citizens of England, and Lionheart, while incorporated in Delaware, is a wholly-owned subsidiary of the BBC. Thus, the dispute is essentially one between two English citizens. The BBC's status as a taxpayer-funded entity also provides England with a strong interest in the outcome of the case. Moreover, an injunction issued by an English court will be enforceable in the United States under the doctrine of comity, provided the English proceedings were orderly, fair and consistent with United States policy. *See Bandes v. Harlow & Jones, Inc.,* 852 F.2d 661, 666 (2nd Cir.1988); *Pravin Banker Assoc., Ltd. v. Banco Popular del Peru,* 165 B.R. 379, 384 (S.D.N.Y.1994).

#### b. *Need to apply foreign law*

■ Although the need to apply foreign law is not in itself reason to dismiss a case for *forum non conveniens, Manu Int'l v. Avon Products,* 641 F.2d 62, 67 (2nd Cir. 1981), the need to apply foreign law to this case militates in favor of dismissal. English law applies to two of Murray's claims. His claim for copyright infringement under English law requires application of English intellectual property law, which differs from American intellectual property law in several respects. (*See* Baldwin Aff. ¶¶ 7, 9–11; Defendants' Reply Memorandum, at 40–42.) The purchase order provides that it is to be construed in accordance with the laws of England, and a New York court would up-

hold that provision absent a violation of a fundamental state policy. *See Cargill, Inc. v. Charles Kowsky Resources, Inc.,* 949 F.2d 51, 55 (2nd Cir.1991).

## CONCLUSION

Defendants' motion is granted, on the condition that: 1) Lionheart consent to jurisdiction in England and 2) defendants waive any statute of limitations defense they are entitled to assert in England.

So ordered.