**Dominic MURRAY, Plaintiff–Appellant,**

v.

**BRITISH BROADCASTING CORPORATION and BBC Lionheart Television International, Defendants–Appellees.**

**No. 626, Docket 95–7458.**

United States Court of Appeals, Second Circuit.

Argued Dec. 15, 1995.

Decided April 10, 1996.

John M. Schwartz, New York City, (Herzfeld & Rubin, Herbert Rubin, David B. Hamm, Noreen M. Giusti, of counsel), for Plaintiff–Appellant.

Roger L. Zissu, New York City (Weiss Dawid Fross Zelnick & Lehrman, Craig S. Mende, of counsel), for Defendants–Appellees.

Before: WINTER, WALKER and CABRANES, Circuit Judges.

WINTER, Circuit Judge:

Dominic Murray, a British national, appeals from Judge Stanton's dismissal of his complaint based on the doctrine of *forum non conveniens*. The action was brought against the British Broadcasting Corporation ("the BBC"), a corporation organized under the laws of the United Kingdom, and BBC Lionheart Television International ("Lionheart"), a Delaware corporation and wholly-owned subsidiary of the BBC. It asserted claims based on copyright infringement under both United States and English law, false designation of origin, and unfair competition. Murray's principal arguments on appeal are that *forum non conveniens* was misapplied either because the district court should have granted greater deference to his choice of forum or because a contingent fee arrangement is not available in the United Kingdom for this kind of litigation. Alternatively, Murray contends that the district court abused its discretion in weighing the various factors applicable under *forum non conveniens* doctrine. We affirm.

## BACKGROUND

Murray is a self-employed designer and manufacturer of costumes and props in London, England. In July 1992, the BBC engaged Murray to produce a disguise costume for Noel Edmonds, the host of a BBC television program styled "Noel's House Party." The costume, named Mr. Blobby, was to be worn by Edmonds in order to surprise celebrity guests on the program. The British public began identifying Mr. Blobby as a character rather than a costume. As a consequence, the Mr. Blobby costume, now worn by an actor instead of Mr. Edmonds, has become an unexpected success and has been put to a wider use. In 1993, the BBC began authorizing and licensing products bearing the likeness of Mr. Blobby in the United Kingdom. According to Murray, he consulted with English counsel at that time concerning an action for infringement of his copyright in the Mr. Blobby costume. He allegedly declined to pursue his claim because he could neither pay the 100,000 to 200,000 pounds necessary to bring his case to trial nor post the security necessary to obtain a loan for that amount. In June 1994, the defendants brought Mr. Blobby to New York for his American debut at the International Licensing and Merchandising Conference and Exposition and began actively marketing Mr. Blobby in the United States. Shortly thereafter, Murray obtained American counsel under a contingent fee arrangement. This action ensued. Although it appears that no Mr. Blobby products have yet been produced for the American market, Murray has also filed suit against several alleged licensees, *Murray v. The Beanstalk Group, et al.*, 95–Civ–5358 (S.D.N.Y. filed July 18, 1995), which is still pending in the Southern District. As noted, Judge Stanton dismissed the action against the BBC and Lionheart on the ground of *forum non conveniens, Murray v. British Broadcasting Corp.*, 906 F.Supp. 858 (1995), and Murray brought this appeal.

## DISCUSSION

### 1. *Deference to Murray's Choice of Forum*

■ The doctrine of *forum non conveniens* permits a court to "resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute," *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507, 67 S.Ct. 839, 842, 91 L.Ed. 1055 (1947), if dismissal would "best serve the convenience of the parties and the ends of justice." *Koster v. (American) Lumbermens Mut. Casualty Co.*, 330 U.S. 518, 527, 67 S.Ct. 828, 833, 91 L.Ed. 1067 (1947). There is ordinarily a strong presumption in favor of the plaintiff's choice of forum, *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255, 102 S.Ct. 252, 265, 70 L.Ed.2d 419 (1981); *Gilbert*, 330 U.S. at 508, 67 S.Ct. at 843 ("the plaintiff's choice of forum should rarely be disturbed"). Where a foreign plaintiff is concerned, however, its choice of forum is entitled to less deference, *Piper Aircraft*, 454 U.S. at 256, 102 S.Ct. at 266. The Supreme Court has emphasized that this rule is not based on a desire to disadvantage foreign plaintiffs but rather on a realistic prediction concerning the ultimate convenience of the forum:

> [w]hen the home forum has been chosen, it is reasonable to assume that this choice is convenient. When the plaintiff is foreign, however, this assumption is much less reasonable. Because the central purpose of any *forum non conveniens* inquiry is to ensure that the trial is convenient, a foreign plaintiff's choice deserves less deference.

*Id.* at 255–56, 102 S.Ct. at 266 (footnote omitted). Nevertheless, some weight must still be given to a foreign plaintiff's choice of forum. *R. Maganlal & Co. v. M.G. Chem. Co.*, 942 F.2d 164, 168 (2d Cir.1991). Indeed, we have cautioned that "this reduced weight is not an invitation to accord a foreign plaintiff's selection of an American forum *no* deference since dismissal for *forum non conveniens* is the exception rather than the rule." *Id.* (citations and internal quotation marks omitted and emphasis added)

Murray quarrels with neither the rule concerning foreign plaintiffs nor the reason underlying it. Instead, he argues that his choice of an American forum must, as a matter of law, be accorded the deference given domestic plaintiffs because of the Berne Convention for the Protection of Literary and Artistic Works, to which both the United States and the United Kingdom are signatories. This is a matter of law that we review *de novo*.

■ The Convention provides in pertinent part that "the extent of protection, *as well as the means of redress afforded to the author to protect his rights*, shall be governed exclusively by the laws of the country where protection is claimed." Berne Convention for the Protection of Literary and Artistic Works, Paris Text, July 24, 1971, Art. V ¶ 2, S. TREATY DOC. NO. 27, 99th Cong., 2d Sess. 40 (1986), *reprinted in* 6 David Nimmer & Melville B. Nimmer, *Nimmer on Copyright*, Appendix 27–5 (1995) (emphasis added). Under the Berne Convention, Murray argues, he is deemed to be in the shoes of an American plaintiff and entitled to greater deference in his choice of forum than the district court believed. The principle set out in Article V, paragraph 2 of the Berne Convention is one of "national treatment," *see Creative Technology, Ltd. v. Aztech Sys. Pte*, 61 F.3d 696, 700 (9th Cir.1995), a choice-of-law rule mandating that the applicable law be the copyright law of the country in which the infringement occurred, not that of the country of which the author is a citizen or in which the work was first published. 3 *Nimmer on Copyright* § 17.05. Murray argues, in essence, that the principle of national treatment contained in the Berne Convention mandates procedural opportunities identical to those accorded American plaintiffs alleging copyright infringement. We disagree.

Murray relies on *Irish Nat'l Ins. Co. v. Aer Lingus Teoranta*, 739 F.2d 90 (2d Cir. 1984), in which we held that the Treaty of Friendship, Commerce and Navigation between the United States and Ireland required the application of the same *forum non conveniens* standards to the Irish plaintiff as a court would have applied to a United States citizen. *Id.* at 91–92. However, we do not agree that *Aer Lingus* applies in the instant matter. The Treaty of Friendship, Commerce and Navigation between the United

States and Ireland provided for "national treatment with respect to ... having access to the courts of justice." *Id.* at 91 (internal quotation marks and citation omitted). In contrast, the national treatment provision of the Berne Convention contains no such language. We are confident that the inclusion of the quoted language in the Treaty with Ireland was not superfluous, and its omission in the Berne Convention was no oversight. When drafters of international agreements seek to provide equal access to national courts, the long-established practice is to do so explicitly. The United States first concluded a treaty with such a provision in 1775, Robert R. Wilson, *Access–to–Courts Provisions in United States Commercial Treaties,* 47 Am. J. Int'l L. 20, 33 (1953), and explicit "access to courts" clauses appear regularly in treaties to which the United States is a signatory. Indeed, over a dozen treaties have included such language since 1990.[1]

History and practice thus teach that a principle of equal access must be explicitly adopted. In the absence of such an explicit provision in the Berne Convention, we cannot construe a simple declaration of "national treatment" to imply such a principle and to extend *Aer Lingus* and cases following it to this case. *Compare Blanco v. Banco Indus. de Venezuela, S.A.,* 997 F.2d 974, 981 (2d Cir.1993) (no lesser presumption accorded to a foreign plaintiff's choice of forum "when a treaty with a foreign nation accords its nationals access to our courts equivalent to that provided American citizens"); *Alcoa Steam-*

*ship Co. v. M/V Nordic Regent,* 654 F.2d 147, 153 n. 6 (2d Cir.) (in banc) (discussing "access to courts" and "no less favorable treatment" clauses in *forum non conveniens* context), *cert. denied,* 449 U.S. 890, 101 S.Ct. 248, 66 L.Ed.2d 116 (1980); *Farmanfarmaian v. Gulf Oil Corp.,* 588 F.2d 880, 882 (2d Cir. 1978) (treaty allowed nationals access to our courts "on terms no less favorable" than those applicable to American citizens).

Murray seeks to bolster his argument by resort to the legislative history of the Berne Convention Implementation Act of 1988. He relies chiefly on House Report Number 609, 100th Cong., 2d Sess. (1988), *reprinted in* 6 *Nimmer on Copyright,* Appendix 32, which states that "[w]hatever restrictions or procedures are imposed on foreign nationals must also be imposed on the citizens of the country where protection is claimed." *Id.* at App. 32–43. However, the House report cannot bear the weight Murray places on it. The discussion in question concerns only the issue of whether the Convention invalidates the procedural registration requirements of the pre-Berne Convention Copyright Act, in particular the 17 U.S.C. § 411(a) requirement that a copyright owner must seek registration of a copyright as a prerequisite to an action for infringement. The discussion has no bearing on the application of the doctrine of *forum non conveniens.*

There is, therefore, little support for Murray's position in the legislative history relied upon, and we conclude that the district court

---

1. *See, e.g.,* Agreement Between the United States of America and the Republic of Latvia on Trade Relations and Intellectual Property Rights Protection, Jul. 6, 1994, Hein's No. KAV 4020; Agreement on Trade Relations Between the United States of America and the Republic of Uzbekistan, Nov. 5, 1993, Hein's No. KAV 3781; Agreement on Trade Relations Between the United States of America and the Government of Romania, Apr. 3, 1992, Hein's No. KAV 3709; Agreement on Trade Relations Between the United States of America and the Republic of Turkmenistan, Mar. 23, 1993, Hein's No. KAV 3704; Agreement on Trade Relations Between the United States of America and the Republic of Georgia, Mar. 1, 1993, Hein's No. KAV 3647; Agreement on Trade Relations Between the United States of America and the Republic of Kazakhstan, May 19, 1992, Hein's No. KAV 3504; Agreement on Trade Relations Between the United States of America and the Republic of Alba-

nia, May 14, 1992, Hein's No. KAV 3433; Agreement on Trade Relations Between the United States of America and the Republic of Kyrgyzstan, May 8, 1992, Hein's No. KAV 3515; Agreement on Trade Relations Between the United States of America and the Republic of Ukraine, May 6, 1992, Hein's No. KAV 3352; Agreement on Trade Relations Between the United States of America and the Union of Soviet Socialist Republics, June 1, 1990, Hein's No. KAV 2609; Agreement on Trade Relations Between the United States of America and the Republic of Armenia, Apr. 2, 1992, Hein's No. KAV 3245; Agreement on Trade Relations Between the Government of the United States of America and the Government of the Mongolian People's Republic, Jan. 23, 1991, Hein's No. KAV 2900; Agreement on Trade Relations Between the Government of the United States of America and the Government of the Republic of Bulgaria, Apr. 22, 1991, Hein's No. KAV 3117.

correctly accorded Murray's choice of forum less deference than that given to domestic plaintiffs.

### 2. *Existence of an Alternative Forum*

▇▇ When addressing a motion to dismiss for *forum non conveniens,* a court must determine whether an alternative forum is available, because application of the doctrine "presupposes at least two forums in which the defendant is amenable to process." *Gilbert,* 330 U.S. at 506–07, 67 S.Ct. at 842. The requirement of an alternative forum is ordinarily satisfied if the defendant is amenable to process in another jurisdiction, except in "rare circumstances" when "the remedy offered by the other forum is clearly unsatisfactory." *Piper Aircraft,* 454 U.S. at 254 n. 22, 102 S.Ct. at 265 n. 22 (dismissal would not be appropriate where the alternative forum does not recognize the cause of action). The BBC can obviously be sued in the United Kingdom. Murray argues, however, that he is financially unable to litigate this dispute in England because a contingent-fee arrangement is not permitted in this kind of case. In his view, this professed inability to bring suit renders the English forum unavailable as a matter of law. We review this legal issue *de novo* but disagree with Murray.

▇▇ There is a division of authority on whether financial hardships facing a plaintiff in an alternative forum as a result of the absence of contingent fee arrangements may cause a forum to be deemed unavailable. *Compare Rudetsky v. O'Dowd,* 660 F.Supp. 341, 346 (E.D.N.Y.1987) ("[t]he lack of a contingency fee system ... does not constitute one of those [rare] circumstances") *with McKrell v. Penta Hotels,* 703 F.Supp. 13, 14 (S.D.N.Y.1989) (denying motion to reject magistrate's report which concluded that alternative forum was not available in part because it had no contingent-fee system). The majority of courts deem a plaintiff's financial hardships resulting from the absence of contingent fee arrangements to be only one factor to be weighed in determining the balance of convenience *after* the court determines that an alternative forum is available. *See Coakes v. Arabian American Oil Co.,* 831 F.2d 572, 575 (5th Cir.1987) (plaintiff

pointing to absence of contingent fee system "cannot actually argue that England is not an available, alternate forum" because defendant is amenable to process there); *Kryvicky v. Scandinavian Airlines Sys.,* 807 F.2d 514, 517 (6th Cir.1986) (holding that financial burden on plaintiff "is only one factor used in the balancing process, and it alone would not bar dismissal based on *forum non conveniens* "); *Reid–Walen v. Hansen,* 933 F.2d 1390, 1393 n. 2 & 1398 (8th Cir.1991) (as part of analysis of private interests favoring or counseling against dismissal, court must consider practical problems, financial and otherwise, encountered by plaintiffs) (citing *Rudetsky,* 660 F.Supp. at 346).

We agree with the majority rule. Balancing the plaintiff's financial burdens as one of several relevant factors serves the "repeatedly emphasized ... need to retain flexibility" in the application of the *forum non conveniens* doctrine. *Piper Aircraft,* 454 U.S. at 249, 102 S.Ct. at 262. Indeed, to do otherwise would render the financial burden on a plaintiff the "determinative factor," *Coakes,* 831 F.2d at 575, notwithstanding overwhelming public and private interests weighing in favor of dismissal of the American action. Such a result would ignore the Supreme Court's admonition that "[i]f central emphasis [is] placed on any one factor, the *forum non conveniens* doctrine would lose much of the very flexibility that makes it so valuable." *Piper Aircraft,* 454 U.S. at 249–50, 102 S.Ct. at 263. As the Fifth Circuit has noted, "[i]f the lack of a contingent-fee system were held determinative, then a case could almost never be dismissed because contingency fees are not allowed in most foreign forums." *Coakes,* 831 F.2d at 576. *See also* William L. Reynolds, *The Proper Forum For a Suit: Transnational* Forum Non Conveniens *and Counter–Suit Injunctions in the Federal Courts,* 70 Tex. L.Rev. 1663, 1669 (1992) ("attorney compensation should not be a controlling factor in the adequate alternative forum inquiry; to make the case turn on that factor, given the uniqueness of the American fee system, would eviscerate *forum non conveniens* " effecting a "back-door gutting of the doctrine"). We therefore conclude that Murray's claim of financial hardship may not be considered in determining the *availability*

ot ⌐          tive forum but must be deferred
to the          cing of interests relating to the
forum's co⌐ ⌐enience.

### 3. The Balancing of Interests

██  Once the court has identified an alternative forum, it must proceed to balance public and private interests to determine whether the convenience of the parties and the ends of justice would best be served by dismissing the action. *See Gilbert,* 330 U.S. at 508–09, 67 S.Ct. at 843. We review the district court's balancing of interests for abuse of discretion. *See Piper Aircraft,* 454 U.S. at 257, 102 S.Ct. at 266.

The public interest factors enumerated in *Gilbert* and summarized in *Piper Aircraft* include: the administrative difficulties flowing from court congestion; the local interest in having controversies decided at home; the interest in having the trial in a forum that is familiar with the law governing the action; the avoidance of unnecessary problems in conflict of laws or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty. *Piper Aircraft,* 454 U.S. at 241 n. 6, 102 S.Ct. at 258 n. 6 (citing *Gilbert,* 330 U.S. at 509, 67 S.Ct. at 843).

Murray argues that two public interest factors weigh strongly in favor of permitting his American action to go forward. First, he argues that American copyright law will apply to his copyright infringement claims arising in the United States, militating in favor of an American forum. Murray argues second that the district court erroneously failed to acknowledge that the United States has localized interests in this controversy: the "obvious interest in securing compliance with this nation's laws by citizens of foreign nations who have dealings within this jurisdiction," *London Film Productions Ltd. v. Intercontinental Communications, Inc.,* 580 F.Supp. 47, 49 (S.D.N.Y.1984), and an interest in whether Mr. Blobby merchandise will be available for sale in the United States. Once again, we disagree.

██  We are, quite frankly, at a loss to see how this lawsuit has any but the most attenuated American connection. The central issue in dispute concerns the circumstances surrounding the creation of Mr. Blobby. Once that dispute is resolved, the right to exploit the character will be quickly resolved. The crux of the matter, therefore, involves a dispute between British citizens over events that took place exclusively in the United Kingdom. Moreover, it appears that much of the dispute over the creation of Mr. Blobby implicates contract law. British law governs those issues. The United States thus has virtually no interest in resolving the truly disputed issues.

██  The Berne Convention's national treatment principle insures that no matter where Murray brings his claim, United States copyright law would apply to exploitation of the character in this country. *See supra.* We therefore see little chance that the United States' interest in the application of its laws would be ill-served by a lawsuit in an English forum. Murray makes a great deal of the need to bring additional litigation in the United States to enforce his copyright if this matter is dismissed in favor of an English forum. However, he has offered no reason why his action against the American licensees of Mr. Blobby, currently pending in the Southern District of New York, *see supra,* may not be placed on the suspense calendar pending a resolution of the truly disputed issues in the English courts. Again, once those issues are resolved, everything else will fall into place.[2]

Finally, we note that the forum in which actual infringement of Murray's putative copyright has occurred is not the United States but England. It appears that no Mr. Blobby products have yet been produced for the American market. In virtually all respects, the connection of this case to the

---

**2.** To the extent that deferring the resolution of the disputed issues to a foreign forum may impede Murray's ability to join Lionheart, a Delaware corporation, in the action, we believe that Lionheart is not essential to the adjudication of the core issues. It appears from the record that Lionheart exists to exploit the BBC's rights in the American market. Any dispute between Murray and Lionheart concerning Mr. Blobby would therefore, as a practical matter, turn on the outcome of the action between Murray and the BBC.

United States is as tenuous as its connection to the United Kingdom is strong. We therefore hold that the district court did not abuse its discretion in finding that the public interest factors militated in favor of dismissal.

We turn now to the balancing of private interests. The relevant private interests set forth in *Gilbert* include the relative ease of access to sources of proof; the availability of compulsory process for attendance of unwilling witnesses; the cost of obtaining attendance of willing witnesses; and all other practical problems that make trial of a case easy, expeditious, and inexpensive—or the opposite. Issues concerning the enforceability of a judgment should also be considered. 330 U.S. at 508, 67 S.Ct. at 843.

■ Murray's challenge to the district court's balancing of private interest factors is largely directed at Judge Stanton's conclusion that the financial "difficulties Murray may encounter in litigating in England are not sufficiently severe" to tip the private interest inquiry in Murray's favor. *Murray*, 906 F.Supp. at 865. We note first that the unavailability of contingent fee arrangements in England is of little weight in the present matter. The availability of such arrangements in the United States is based on a policy decision regarding the assertion of rights in American courts where the parties or the claims have some tangible connection with this country. The decision to permit contingent fee arrangements was not designed to suck foreign parties disputing foreign claims over foreign events into American courts. There is, therefore, no American policy regarding contingent fees that weighs in favor of resolving the underlying dispute over the rights to Mr. Blobby in an American court.

■ In any event, we agree with Judge Stanton's conclusion that Murray's financial condition is less severe than those that have previously justified retention of litigation in an otherwise inconvenient forum. *Id.*, 906 F.Supp. at 864. Murray mischaracterizes that conclusion by arguing that the district court implicitly and erroneously held that a plaintiff must be "destitute" before losing the ability to litigate in a foreign forum. Judge Stanton merely surveyed the caselaw and

sensibly observed that plaintiffs found to be unable to litigate in a foreign forum "generally ha[ve] a much lower income and fewer assets than Murray." *Id.*

We are also unpersuaded by Murray's argument that his financial condition poses insurmountable barriers to litigation in England. For the calendar year ending October 31, 1992, Murray had total pre-tax personal income, after business expenses, of 46,066 pounds sterling and 57,515 pounds sterling for the year ending October 31, 1993, with an estimated 1994 pre-tax income of approximately 45,000 pounds sterling. *Id.* Moreover, we cannot disturb the district court's factual finding that Murray is "credit-worthy." *Id.* Murray has referred us to no case holding that a plaintiff in a similar financial position was financially unable to litigate. In the absence of such authority, we are not prepared to hold that the district court was in error in concluding that Murray is "not of such limited means that the English prohibition on contingent-fee arrangements would prevent him from pursuing his claim." *Id.*

■ There is no merit in Murray's objections to the district court's balancing of the remaining private interest factors. Murray suggests that the defendants have strained to "pad" their list of English witnesses, raising false issues and naming witnesses who are irrelevant or peripheral to whether he possesses a copyright in Mr. Blobby. This characterization is in fact a caricature that vastly oversimplifies the issues in this case, which entail all the details of his relationship with the BBC and of the creative efforts and contribution of ideas by him and others. Indeed, it appears that Murray himself discarded design drawings prepared during the construction of the Mr. Blobby costume. As the district court found, therefore, the testimony of "Noel's House Party" personnel and the assistants in Murray's studio will be crucial in determining the relative contributions of Murray and the BBC staff. *Id.* Nor can we agree with Murray that numerous witnesses on the appellees' witness list, claimed by appellees to be relevant to the existence of equitable ownership or an implied license to use Mr. Blobby, are in fact unnecessary. Murray has failed to convince us that appellees' equitable ownership claim is frivolous, and trial of this claim will require the testi-

mony of English witnesses. In addition, a major issue in this action concerns the terms of the contract between Murray and the BBC. To the extent that this inquiry necessarily includes within its ambit the scope of any implied license to exploit Mr. Blobby, these issues also require testimony from English witnesses concerning the parties' contractual intent. In short, the district court in no way abused its discretion in finding that the location of witnesses weighed heavily in favor of appellees.

With respect to the location of documentary and physical evidence, Judge Stanton concluded that virtually all of it is located in England. *Id.* at 863. Murray disputes this, arguing that the burden on the appellees of trying the case in the United States was "greatly overstated" by the district court. We do not agree. First, as Judge Stanton found, appellees might be unable to compel third parties in England to produce documents—specifically, telephone records and documents evidencing Murray's course of dealings with customers other than the BBC—for a trial in the United States. In addition, we note that Judge Stanton conceded that "it would not be overly burdensome for the defendants to transport that [documentary] evidence, which consists of a moderate number of documents, notebooks, drawings, costumes, and props, to the United States." *Id.* He found, however, that the possibility that appellees might not be able to compel third parties located in England to produce documents tipped in favor of appellees. *Id.* We do not think that Judge Stanton overstated the burden on appellees. We therefore hold that he did not abuse his discretion in finding that the location of proof preponderated in favor of the BBC. Thus, all of the relevant private interest factors favor appellees. *See Blanco,* 997 F.2d at 982 (private interest factors strongly favor dismissal when most witnesses and physical and documentary evidence are located in other forum) (citing *Gilbert,* 330 U.S. at 508, 67 S.Ct. at 843).

We therefore affirm.