MARK C. DURKIN, ADMINISTRATOR (ESTATE OF ANDREW CONSTANTINIDIS), ET AL. *v.*
INTEVAC, INC., ET AL.
(SC 16386)

Sullivan, C. J., and Borden, Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.

---

Argued February 13—officially released October 30, 2001

*Mark R. Kravitz*, with whom were *Jeffrey R. Babbin* and, on the brief, *Victor A. Bolden, Patrick J. Corcoran, Kevin C. Shea, Patrick M. Noonan, Frank J. Silvestri, Jr., S. Dave Vatti, Charles S. Tusa, Charles P. Reed,*

*Donald E. Frechette* and *Christopher J. Lynch,* for the appellants (defendants).

*Vincent M. Musto,* with whom, on the brief, were *Rosalind J. Koskoff* and *Joel T. Faxon,* for the appellees (plaintiffs).

*Janet C. Spegele, Cynthia L. Amara* and *Loretta M. Smith* filed a brief for the Connecticut Business and Industry Association et al. as amici curiae.

*Opinion*

ZARELLA, J. This is a products liability action arising out of a military helicopter collision that occurred in Australia on June 12, 1996. The primary issue in this interlocutory appeal[1] is whether the trial court abused

[1] The Chief Justice granted the defendants' petition for certification to appeal pursuant to General Statutes § 52-265a and Practice Book § 83-1.

General Statutes § 52-265a provides: "(a) Notwithstanding the provisions of sections 52-264 and 52-265, any party to an action who is aggrieved by an order or decision of the Superior Court in an action which involves a *matter of substantial public interest and in which delay may work a substan*tial injustice, may appeal under this section from the order or decision to the Supreme Court within two weeks from the date of the issuance of the order or decision. The appeal shall state the question of law on which it is based.

"(b) The Chief Justice shall, within one week of receipt of the appeal, rule whether the issue involves a substantial public interest and whether delay may work a substantial injustice.

"(c) *Upon certification by the Chief Justice that a substantial public* interest is involved and that delay may work a substantial injustice, the trial judge shall immediately transmit a certificate of his decision, together with a proper finding of fact, to the Chief Justice, who shall thereupon call a *special session of the Supreme Court for the purpose of an immediate* hearing upon the appeal.

"(d) The Chief Justice may make orders to expedite such appeals, including orders specifying the manner in which the record on appeal may be prepared."

Practice Book § 83-1 provides in relevant part: "Prior to filing an appeal pursuant to General Statutes § 52-265a, the party seeking to appeal shall, within two weeks of the issuance of the order or decision of the superior court, submit an original plus three copies of an application for certification by the chief justice (1) stating the question of law on which the appeal is to be based, (2) describing the substantial public interest that is alleged to

its discretion in denying the defendants' motions to dismiss on the ground of forum non conveniens. We conclude that the doctrine of forum non conveniens requires that the action be dismissed. Accordingly, we reverse the decision of the trial court to the contrary.

On June 12, 1996, in Northern Queensland, Australia, two Australian military Black Hawk helicopters collided in midair and crashed during a training exercise, killing eighteen military personnel and injuring several others. The plaintiffs, who all are Australian citizens, are either persons injured in the collision or the estates of persons killed in the collision. The plaintiffs brought this action in Connecticut in several counts based on products liability, negligence and breach of express and implied warranties. The plaintiffs alleged that the collision was caused by, inter alia, design or manufacturing defects in the night vision goggles and the helicopters used in the training exercise. The defendants,[2] which were involved in the manufacturing process of either the night vision goggles, the helicopters or devices used therewith, moved to dismiss the complaint on the ground of forum non conveniens. The trial court denied the defendants' motions. This certified interlocutory appeal followed.

---

be involved, and (3) explaining why delay may work a substantial injustice. . . ."

[2] The defendants are Intevac, Inc., a California corporation with its principal place of business in Santa Clara, California; United Technologies Corporation, a Delaware corporation with its principal place of business in Hartford; Raytheon Optical Systems, Inc., formerly known as Hughes Danbury Optical Systems, Inc., a Delaware corporation with its principal place of business in Danbury; Hoffman Engineering Corporation, a Delaware corporation with its principal place of business in Stamford; Litton Industries, Inc., a Delaware corporation with its principal place of business in Woodland Hills, California; ITT Industries, Inc., an Indiana corporation with its principal place of business in White Plains, New York; and Gentex Corporation, a Delaware corporation with its principal place of business in Carbondale, Pennsylvania.

The relevant facts are derived from the plaintiffs' complaint, the affidavits filed in support of and in opposition to the defendants' motions to dismiss and a certain Board of Inquiry[3] summary, described more fully later in this opinion, which the defendants submitted in support of their evidentiary contentions. On June 12, 1996, members of the Australian Army's Special Air Service Regiment were conducting training with members of the Army's Fifth Aviation Regiment at the High Ridge Training Area in Northern Queensland. The training included a nighttime, live fire exercise during which the Special Air Service troops would rappel from helicopters in a simulated attack on a terrorist encampment. The training was in preparation for the 2000 Sydney Olympics.

At approximately 6:45 p.m., one of the six helicopters participating in the exercise made physical contact with another helicopter. The main rotor blades from the first helicopter sliced through the fuselage and the tailboom of the second helicopter, causing damage to the second helicopter's control and guidance systems, an engine, the cargo compartment, the structural frame and one of its fuel tanks. The fuel from the ruptured fuel tank of the second helicopter came into contact with the first helicopter's engine and caused an explosion between the aircraft, both of which caught fire. The collision sheared the main rotor blades from the first helicopter, causing it to roll to the left and eventually crash to the ground; the first helicopter exploded upon contact with the ground and was consumed by fire. The second helicopter lost control, spun and eventually crashed to the ground. Fire, fed by ignited fuel from a

[3] Lieutenant General John Murray Sanderson, Chief of the General Staff of the Australian Army, established a Board of Inquiry comprised of appointed military personnel to inquire into the causes of and circumstances surrounding the June 12, 1996 collision of the Black Hawk helicopters and to make recommendations on the basis of its findings.

ruptured fuel cell, spread throughout the second helicopter.

Eleven occupants of the first helicopter and seven occupants of the second helicopter were killed in the crash. The eighteen deaths constituted the largest peacetime military disaster in Australia since 1964.

After the accident, the Chief of the General Staff of the Australian Army convened a Board of Inquiry (board) to investigate the accident, determine its causes and make recommendations designed to prevent future accidents from occurring.[4] The board conducted investigations, interviewed 144 witnesses, generated over 7000 pages of records and transcripts and reported its findings. The 144 witnesses were nearly all Australian military personnel, and among them were: persons who had survived the crash; persons who had witnessed the crash; persons who had planned the training exercise; persons responsible for the safety of planning; persons responsible for the maintenance of the equipment involved; and persons responsible for the training of Australian military personnel. The board reported fourteen "primary causes" and twenty-four "contributory factors" of the accident. Among the causes and contributory factors were: (1) deficiencies in leadership in carrying out the training exercise; (2) aircrew error; (3) inadequate planning; (4) lack of sufficiently experienced aircrew members; and (5) failure to "make proper allowance for" the limitations and characteristics of night vision goggles in view of the lighting conditions and objectives of the training exercise.[5]

---

[4] See footnote 3 of this opinion.

[5] The board heard evidence that night vision goggles generally have physical limitations and characteristics, namely:

"a. a limited and maximum field of view . . . of [forty] degrees (compared with 210 [degrees] for normal human day vision);

"b. limitations on the ability to accurately discern depth, distance and rate of closure due to the absence of normal stereoscopic vision;

"c. a monochromatic (green and black) display;

"d. a heightened susceptibility to visual perception illusions; and

The plaintiffs alleged in their complaint that the collision "was caused by the failure of the night vision goggles to enable the crew members of one helicopter to adequately determine the location of the other helicopter," and that this failure was the result of the negligence of certain defendants, namely, Intevac, Inc., Litton Industries, Inc., ITT Industries, Inc., Hoffman Engineering Corporation, Raytheon Optical Systems, Inc., and Gentex Corporation, in designing, testing and manufacturing the goggles, testing devices used in conjunction with the goggles and the helmets to which the goggles were secured. The plaintiffs also alleged that a certain defect in the Black Hawk helicopter, which was designed and manufactured by one of the defendants, United Technologies Corporation, caused the collision.

In their motions to dismiss and memoranda of law in support thereof, the defendants argued that Connecticut would be an inconvenient forum in which to defend. The defendants argued that an analysis of the relevant factors set forth in *Gulf Oil Corp.* v. *Gilbert*, 330 U.S. 501, 508–509, 67 S. Ct. 839, 91 L. Ed. 1055 (1947), and *Picketts* v. *International Playtex, Inc.*, 215 Conn. 490, 497–99, 576 A.2d 518 (1990), favored an Australian forum.

In advancing this claim, the defendants urged the trial court to balance the hardships that would befall the parties depending upon which forum ultimately was selected. In particular, the defendants highlighted the difficulties that they would encounter in mounting a defense in the Connecticut forum in light of the fact that all sources of proof documented in the report of the extensive board investigation were located in Australia. The defendants claimed that most, if not all, of their

---

"e. visual acuity approximately half as good as normal vision."

The board ultimately found that, notwithstanding these limitations and characteristics, "the [night vision goggles] in use on this mission [were] the best commercially available at the time . . . ."

witnesses were beyond the compulsory process of a Connecticut court. The defendants further argued that the board report squarely affixed responsibility for the accident on human error and a poorly planned training exercise, conclusions that were gleaned from evidence that is located in Australia. Finally, the defendants noted that trying the case in the Connecticut forum would prevent them from impleading the Australian government as a third party defendant for contribution purposes.

The plaintiffs contended, inter alia, that the defendants' motions to dismiss should be denied because many of the sources of evidence necessary to prove their products liability action were located in Connecticut. The plaintiffs noted that four of the defendants, including United Technologies Corporation, had significant operations or, at least, were located, in Connecticut. The plaintiffs argued that, because of the limited discovery allowed in Queensland, and the additional complications posed by the Convention on the Taking of Evidence Abroad in Civil or Commercial Matters,[6] the plaintiffs would be unable to discover documents and depose witnesses located in Connecticut adequately.

The trial court, relying on *Picketts* v. *International Playtex, Inc.*, supra, 215 Conn. 490, and *Miller* v. *United Technologies Corp.*, 40 Conn. Sup. 457, 515 A.2d 390 (1986), denied the defendants' motions. The trial court first determined that Australia was an adequate alternative forum, rejecting the plaintiffs' contention that Australia was an inadequate alternative forum because the "likely . . . costs of prosecuting the case to trial in Queensland would exceed the realistic, potential recovery should the action be successful." (Internal quotation marks omitted.) The court also rejected the plaintiffs'

---

[6] Opened for signature March 18, 1970, 23 U.S.T. 2555, T.I.A.S. No. 7444.

claim that, because of the expense involved in trying the case in Queensland, and because Australia does not permit contingency fee arrangements, they would be unable to obtain counsel.

Thereafter, the court balanced the relevant private interest factors. The factors that the court considered were: "(1) the relative ease of access to sources of proof; (2) the availability of compulsory process for attendance of unwilling witnesses, and the cost of obtaining attendance of willing witnesses; (3) the possibility of viewing the accident scene if such viewing is appropriate to the action; (4) the enforceability of a judgment; (5) the relative advantages and obstacles to fair trial; and (6) all other practical problems that make trial of a case easy, expeditious and inexpensive."[7] (Internal quotation marks omitted.) The court concluded that the private interest factors favored Connecticut as the appropriate forum.

Although the trial court's determination that the private interest factors favored Connecticut as the appropriate forum constituted the decisive factor in denying the defendants' motions to dismiss, the court also considered the public interest factors. The court considered the following factors: "(1) administrative difficulties for the courts, i.e., court congestion and the court's familiarity with the applicable law; (2) imposing the burden of jury duty on [the] people of a community with no relation to the litigation; (3) holding trial in the view of interested persons; and (4) having matters decided in their local forum."[8] (Internal quotation marks omitted.)

---

[7] The trial court quoted *Miller* v. *United Technologies Corp.*, supra, 40 Conn. Sup. 463, in listing these factors. These factors were derived from the United States Supreme Court's decision in *Gulf Oil Corp.* v. *Gilbert*, supra, 330 U.S. 501. See id., 508.

[8] The trial court quoted *Miller* v. *United Technologies Corp.*, supra, 40 Conn. Sup. 466, in listing these factors, which, in turn, cites, among other cases, *Gulf Oil Corp.* v. *Gilbert*, supra, 330 U.S. 508.

The court concluded that, "[e]ven though public interest factors favor Australia, the private interest factors favor Connecticut. The private interest factors . . . outweigh the public interest factors." Accordingly, the trial court denied the defendants' motions to dismiss on the ground of forum non conveniens. The trial court also concluded that the motions to dismiss filed by certain defendants, namely, Intevac, Inc., United Technologies Corporation, Litton Industries, Inc., Gentex Corporation, Hoffman Engineering Corporation and Raytheon Optical Systems, Inc., did not "invoke" Practice Book § 10-30[9] or § 10-32.[10]

I

The defendants claim that the trial court abused its discretion in denying their motions to dismiss on the ground of forum non conveniens. We agree.

We begin with the applicable standard of review and the well established legal principles that guide our analysis of the defendants' claim. A ruling on a motion to dismiss for forum non conveniens is reviewed under an abuse of discretion standard. *Picketts* v. *International Playtex, Inc.*, supra, 215 Conn. 500; *Union Carbide Corp.* v. *Aetna Casualty & Surety Co.*, 212 Conn. 311, 319, 562 A.2d 15 (1989); cf. *Irish National Ins. Co., Ltd.* v. *Aer Lingus Teoranta*, 739 F.2d 90, 92 (2d Cir. 1984). "As a common law matter, the doctrine of forum non conveniens vests discretion in the trial court to decide where trial will best serve the convenience of the parties

[9] Practice Book § 10-30 provides in relevant part: "Any defendant, wishing to contest the court's jurisdiction, may do so even after having entered a general appearance, but must do so by filing a motion to dismiss within thirty days of the filing of an appearance. . . ."

[10] Practice Book § 10-32 provides: "Any claim of lack of jurisdiction over the person or improper venue or insufficiency of process or insufficiency of service of process is waived if not raised by a motion to dismiss filed in the sequence provided in Sections 10-6 and 10-7 and within the time provided by Section 10-30."

and the ends of justice. . . . In our application of the abuse of discretion standard, we must accept the proposition that simply to disagree with the [trial] court as if the facts had been presented to this court in the first instance cannot be the basis of our decision." (Citations omitted; internal quotation marks omitted.) *Picketts* v. *International Playtex, Inc.*, supra, 500. "[T]he trial court's exercise of its discretion may be reversed only upon a showing of clear abuse. [W]here the court has considered all relevant public and private interest factors, and where its balancing of these factors is reasonable, its decision deserves substantial deference." (Internal quotation marks omitted.) *Union Carbide Corp.* v. *Aetna Casualty & Surety Co.*, supra, 319. "Meaningful review, even from this circumscribed perspective, nonetheless encompasses a determination whether the trial court abused its discretion as to either the facts or the law. . . .

"Emphasis on the trial court's discretion does not, however, overshadow the central principle of the forum non conveniens doctrine that unless the balance is strongly in favor of the defendant[s], the [plaintiffs'] choice of forum should rarely be disturbed. . . . Although it would be inappropriate to invoke [a] rigid rule to govern discretion . . . it bears emphasis that invocation of the doctrine of forum non conveniens is a drastic remedy . . . which the trial court must approach with caution and restraint. The trial court does not have unchecked discretion to dismiss cases from [the plaintiffs'] chosen forum simply because another forum, in the court's view, may be superior to that chosen by the plaintiff[s]. . . . Although a trial court applying the doctrine of forum non conveniens must walk a delicate line to avoid implicitly sanctioning forum-shopping by either litigant at the expense of the other . . . it cannot exercise its discretion in order to level the playing field between the parties. The [plain-

tiffs'] choice of forum, which may well have been chosen precisely because it provides the plaintiff[s] with certain procedural or substantive advantages, should be respected unless equity weighs strongly in favor of the defendant[s]. . . .

"[T]he overriding inquiry in a forum non conveniens motion is not whether some other forum might be a good one, or even a better one than the [plaintiffs'] chosen forum. The question to be answered is whether [the plaintiffs'] chosen forum is itself inappropriate or unfair because of the various private and public interest considerations involved. . . . Accordingly, the trial court, in exercising its structured discretion, should place its thumb firmly on the [plaintiffs'] side of the scale, as a representation of the strong presumption in favor of the [plaintiffs'] chosen forum, before attempting to balance the private and public interest factors relevant to a forum non conveniens motion.

"When, as in the present action, the plaintiffs are foreign to their chosen forum, the trial court must readjust the downward pressure of its thumb, but not remove it altogether from the plaintiffs' side of the scale. Even though the plaintiffs' preference has a diminished impact because the plaintiffs are themselves strangers to their chosen forum . . . Connecticut continues to have a responsibility to those foreign plaintiffs who properly invoke the jurisdiction of this forum . . . especially in the somewhat unusual [situation in which] it is the forum resident who seeks dismissal. . . . [Therefore] [w]hile the weight to be given to the choice of a domestic forum by foreign plaintiffs is diminished, their entitlement to a preference does not disappear entirely. The defendants challenging the propriety of this choice continue to bear the burden to demonstrate why the presumption in favor of [the plaintiffs'] choice, weakened though it may be, should be disturbed." (Citations omitted; internal quotation marks omitted.) *Pick-*

*etts* v. *International Playtex, Inc.*, supra, 215 Conn. 500–502.

With these principles in mind, we turn to the four step process for examining forum non conveniens claims outlined in *Gulf Oil Corp.* v. *Gilbert*, supra, 330 U.S. 508–509, and clearly set forth in *Pain* v. *United Technologies Corp.*, 637 F.2d 775, 784–85 (D.C. Cir. 1980), cert. denied, 454 U.S. 1128, 102 S. Ct. 980, 71 L. Ed. 2d 116 (1981), which we have stated is a "useful frame of reference for the law of Connecticut." *Picketts* v. *International Playtex, Inc.*, supra, 215 Conn. 497; see *Union Carbide Corp.* v. *Aetna Casualty & Surety Co.*, supra, 212 Conn. 319. First, the court should determine whether an adequate alternative forum exists that possesses jurisdiction over the whole case. *Pain* v. *United Technologies Corp.*, supra, 784. Second, the court should consider all relevant private interest factors with a strong presumption in favor of—or, in the present case, a weakened presumption against disturbing—the plaintiffs' initial choice of forum. Id. Third, if the balance of private interest factors is equal, the court should consider whether any public interest factors tip the balance in favor of trying the case in the foreign forum. Id. Finally, if the public interest factors tip the balance in favor of trying the case in the foreign forum, "the court must . . . ensure that [the] plaintiffs can reinstate their [action] in the alternative forum without undue inconvenience or prejudice." Id., 784–85.

We agree with the trial court's conclusion that Australia is an adequate forum. On appeal, the plaintiffs do not claim otherwise, and this view is consistent with findings by other courts that Australia is an adequate forum. See, e.g., *Allstate Life Ins. Co.* v. *Linter Group Ltd.*, 994 F.2d 996, 1001–1002 (2d Cir.), cert. denied, 510 U.S. 945, 114 S. Ct. 386, 126 L. Ed. 2d 334 (1993) (securities fraud); *Great Prize, S.A.* v. *Mariner Shipping Party, Ltd.*, 967 F.2d 157, 160 (5th Cir. 1992) (dis-

pute regarding ownership of property); see also *In re Silicone Gel Breast Implants Products Liability Litigation*, 887 F. Sup. 1469, 1475 (N.D. Ala. 1995) (product liability for silicone gel breast implants). Accordingly, we do not disturb the trial court's conclusion concerning this threshold issue.

The plaintiffs also do not challenge the trial court's conclusion that the *public* interest factors favor trying the case in Australia. Thus, the balancing of the private interest factors is dispositive of the defendants' forum non conveniens claim. We are persuaded that the defendants adequately have demonstrated that the private interest factors sufficiently weighed in favor of dismissal to overcome the diminished deference accorded to the foreign plaintiffs' choice of forum.

We agree with the trial court that the relevant private interest factors are: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process for the attendance of unwilling witnesses, and the cost of obtaining attendance of willing witnesses; (3) the possibility of viewing the accident scene if such viewing is appropriate to the action; (4) the enforceability of a judgment; (5) the relative advantages and obstacles to a fair trial; and (6) all other practical problems that make the trial of a case easy, expeditious and inexpensive. *Gulf Oil Corp.* v. *Gilbert*, supra, 330 U.S. 508. We examine each of these factors in turn, keeping in mind that, consistent with the flexibility necessary in a forum non conveniens analysis, no single factor should be given undue weight. See, e.g., *Piper Aircraft Co.* v. *Reyno*, 454 U.S. 235, 249–50, 102 S. Ct. 252, 70 L. Ed. 2d 419 (1981) ("[i]f central emphasis were placed on any one factor, the forum non conveniens doctrine would lose much of the very flexibility that makes it so valuable").

The assessment of the relative ease of access to sources of proof and the availability of witnesses for

trial generally requires that the trial court become "entangled in the merits of the underlying dispute." *Van Cauwenberghe* v. *Biard*, 486 U.S. 517, 528, 108 S. Ct. 1945, 100 L. Ed. 2d 517 (1988). As the dissent aptly notes, to examine such factors, "the court must scrutinize the substance of the dispute between the parties to evaluate what proof is required, and determine whether the pieces of evidence cited by the parties are critical, or even relevant, to the [plaintiffs'] cause of action and to any potential defenses to the action."

In the present case, the defendants argue that all sources of proof documented in the board's report of its exhaustive investigation are located in Australia, and that the board found that negligence in the planning and operation of the training exercise, and not poorly or defectively engineered aircraft or night vision goggles, caused the accident. Specifically, the board identified fourteen primary causes and twenty-four factors that contributed to the accident, none of which implicated the design or manufacturing integrity of the Black Hawk helicopter or the night vision goggles.[11] The board found

---

[11] The board summarized those causes as follows:

"a. [A]ircraft unserviceability in [1994 and 1995] which reduced the opportunity for pilots to gain experience and proficiency in flying [counterterrorism/special recovery operation] missions;

"b. [H]igh pilot separation rates which further eroded the experience base of [the Fifth Aviation Regiment];

"c. [I]nadequate and untimely joint exercise planning between [the Special Air Service Regiment] and [the Fifth Aviation Regiment];

"d. [I]nadequate supervision and checking of delegated exercise planning tasks by responsible superior commanders;

"e. [I]ncomplete and uncoordinated reconnaissance of the exercise site, including inadequate air photography of [Fire Support Base] Barbara;

"f. [I]naccurate diagrammatic representation of [Fire Support Base] Barbara which was used for briefing both [the Special Air Service Regiment] ground assault teams and [the Fifth Aviation Regiment] aircrews;

"g. [C]hanging the flight profile and direction for the night mission from that which had been [practiced] in the day airmobile assault;

"h. [E]mploying a complex flight formation which permitted no individual aircraft manoeuvre flexibility, and with no abort procedure [practiced], under [night vision goggle] conditions on a tight objective with no vertical

that the design and performance of the Black Hawk helicopter and the night vision goggles, aside from the inherent limitations of the latter; see footnote 5 of this opinion; were not causes of the accident.[12] We note that the plaintiffs have offered no evidence to show that that military hardware was defective or was a cause of the accident. We recognize that the defendants bore the burden of demonstrating that the case should be dismissed, and we review this case, as did the trial court, as one sounding in products liability. Nevertheless, we also view the board's unequivocal finding that the accident was caused by poor planning and implementation, and not by defective products, as highlighting the importance of access to the board's report and the evidence and statements of witnesses upon which that report was based. In this connection, we note that the board

---

identifying features;

"i. [A]ppointing an inexperienced Flight Lead to lead the formation on a combined arms, live firing, [night vision goggle], three aircraft abreast airmobile assault mission;

"j. [F]ailure of the Air Element Commander . . . to exercise command and control of the formation in the air because of his involvement as the flying pilot of one of the assault helicopters; and

"k. [F]ailure of the [Air Element Commander] or any other pilot to inform Flight Lead that he was off track and that difficulty in identifying individual roping and firing points was being experienced."

[12] Generally, the board found that "no equipment malfunction or failure contributed to [the] accident." Specifically, the board found that "no fault is attributed to Black Hawk aircraft for any aspect of [the] accident." In addition, the board found "that the crashworthy design of [the] Black Hawk [helicopter] materially contributed to the survival of [the] occupants of [the second helicopter] . . . ."

The board's findings with respect to night vision goggles identified poor planning in light of the known limitations of night vision technology. The board found deficiencies in "implementing changes to the mission between the day mission and the night . . . mission without [the] benefit of rehearsal" and in the "failure to make proper allowance for the known characteristics and limitations of [night vision goggles], especially with respect to . . . the extraordinary demands on aircrew to maintain aircraft separation in a three aircraft line abreast formation [and] the mode of terrain flight . . . height and airspeed while using [night vision goggles] contrary to Army Flying Order 2.7.6 . . . ."

convened under the direction of the Chief of the General Staff of the Australian Army and, in light of the fact that the board's findings that inadequate planning, training and negligence on the part of certain military personnel caused the accident were against the interests of the Australian Army, there is no reason to discredit the board's findings.

The accessibility of evidence in the present case is affected by the operation of international pretrial discovery procedures. Both Australia and the United States are signatories to the Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, opened for signature March 18, 1970, 23 U.S.T. 2555, T.I.A.S. No. 7444 (Hague Convention). Although the Hague Convention guides and expedites the procurement of evidence in international disputes, its operation has been called "far from perfect." *Pain* v. *United Technologies Corp.*, supra, 637 F.2d 788; cf. *Lony* v. *E.I. Du Pont de Nemours & Co.*, 935 F.2d 604, 609 (3d Cir. 1991) ("Hague Convention procedures assure that some evidence from each forum will be available in the other"). Article 10 of the Hague Convention[13] authorizes a party seeking to employ a foreign court's compulsory powers in order to obtain evidence to file a "Letter of Request." *Pain* v. *United Technologies Corp.*, supra, 788 n.67. When such a request is filed, "the recipient nation's executing authority is required to assist an American court with such compulsory force as its own courts can exercise in a pretrial evidentiary situation . . . ." Id., 788. There are various ways in which countries can opt out of complying with such a request, however. For example, the Hague Convention authorizes signatories to decline

---

[13] Article 10 of the Hague Convention provides: "In executing a Letter of Request the requested authority shall apply the appropriate measures of compulsion in the instances and to the same extent as are provided by its internal law for the execution of orders issued by the authorities of its own country or of requests made by parties in internal proceedings." Hague Convention, art. 10, 23 U.S.T. 2561–62.

to execute letters of request if "the State addressed considers that its sovereignty or security would be prejudiced thereby." Hague Convention, art. 12 (b), 23 U.S.T. 2562. Moreover, the Hague Convention contains a provision allowing signatories to opt out of executing letters of request for pretrial discovery of documents. Id., art. 23, 23 U.S.T. 2568.[14] Every signatory to the Hague Convention, with the exception of the United States, has invoked article 23 and opted out of executing letters of request. E.g., *Pain* v. *United Technologies Corp.*, supra, 788 n.69. Thus, it appears that if the case were to be tried in Australia, Connecticut would be bound to execute any letters of request originating in Australia, provided that the United States did not decide that its sovereignty would be prejudiced by execution of those letters of request. See Hague Convention, art. 12 (b), 23 U.S.T. 2562. On the other hand, if the case were tried in Connecticut, Australia might not execute letters of request from the United States in light of the fact that Australia previously has opted out of executing letters of request under article 23 of the Hague Convention.

The defendants submitted a uniform offer to the trial court, which provided that, if this action were dismissed on the ground of forum non conveniens and brought in Australia, they would provide proper discovery.[15] The defendants' offer is nearly identical to offers upon which numerous other courts have relied in dismissing, on the ground of forum non conveniens, actions filed by foreign plaintiffs in American courts. See, e.g., *Kilvert* v.

---

[14] Article 23 of the Hague Convention provides: "A Contracting State may at the time of signature, ratification or accession, declare that it will not execute Letters of Request issued for the purpose of obtaining pre-trial discovery of documents as known in Common Law countries." Hague Convention, art. 23, 23 U.S.T. 2568.

[15] The defendants specifically agreed to "make their personnel and records available for the litigation in Australia" and agreed to "consent to the reopening of [this] action in Connecticut [if that condition is] not met as to any proper defendant in [the] action."

*Tambrands, Inc.*, 906 F. Sup. 790, 791, 798 (S.D.N.Y. 1995); cf. *Dowling* v. *Hyland Therapeutics Division, Travenol Laboratories, Inc.*, 767 F. Sup. 57, 60 (S.D.N.Y. 1991). Notwithstanding the defendants' stipulation, Queensland civil procedure rules provide for pretrial discovery, including depositions and interrogatories.[16]

With regard to the availability of compulsory process to compel unwilling witnesses—the second factor in our analysis—the defendants bear the burden of identifying the key witnesses and establishing generally what their testimony will cover. *Picketts* v. *International Playtex, Inc.*, supra, 215 Conn. 509. The defendants must go beyond a "mere assertion" that the evidence is in another forum; id., 510; and must establish who the key witnesses are and that their testimony is material. Id., 509–10. "Requiring extensive investigation [however] would defeat the purpose of [the defendants'] motion [to dismiss]." *Piper Aircraft Co.* v. *Reyno*, supra, 454 U.S. 258. A hearing on a motion to dismiss on the ground of forum non conveniens, therefore, reflects "both the preliminary nature of the question and the counterproductivity of substantial discovery before dismissing an action so that it can be reinstituted elsewhere." *Lony* v. *E.I. Du Pont de Nemours & Co.*, supra, 935 F.2d 614. As this court has reasoned, "a motion for dismissal on the ground of forum non conveniens [by necessity] must be heard on a record that is less specific than [the court] would require for a trial on the merits."

---

[16] The defendants and plaintiffs each submitted affidavits from attorneys in Australia concerning pretrial discovery procedures and policies in that country, along with copies of the local rules. Depositions are permitted under Queensland civil procedure rules. E.g., Queensl. Civ. P. r396 (1999) ("[t]he court may, for obtaining evidence for use in a proceeding, order the examination on oath of a person before a judge, magistrate or another person appointed by the court as an examiner"). In addition, depositions may be admitted at trial. Queensl. Civ. P. r407 (1999). Finally, other discovery tools exist, such as interrogatories and mechanisms for compelling non-party disclosure.

*Union Carbide Corp.* v. *Aetna Casualty & Surety Co.*, supra, 212 Conn. 321.

We conclude that the defendants have established that key witnesses would be unavailable if the case were to remain in Connecticut. The defendants submitted information about witnesses to the trial court, consisting of portions of the board's report, along with indexes, which showed the names and, where applicable, the military statuses of those witnesses. The board's report derived, in part, from information discovered at hearings conducted over a three month period, at which 144 witnesses gave testimony and during which 217 exhibits were submitted. The defendants represented to the trial court that they would call many of the 144 witnesses in defense of this action. The board's report identifies each witness and refers to the pages of the transcript at which each witness' testimony can be found and to any exhibits that are relevant to a witness' testimony. In addition, the defendants specifically identified four witnesses that they intend to call at trial, all of whom reside in Australia, and the substance of their testimony. For example, the testimony of the only pilot to have survived the collision, Captain D.K. Burke, occupied over 100 pages of transcript. The defendants identified other important witnesses who survived the collision, including Wing Commander K.P. Roberts, Lieutenant R.J.A. Garvey and Major R. Crowe. Additionally, the defendants identified three other Australian servicemen, namely, Major J.W. Phasey, Lieutenant Colonel O.E. Aberle and Sergeant M.R. White, whose testimony regarding the condition of the helicopters immediately before the training exercise would be essential to defend the action. The foregoing witnesses, and almost all of the 144 witnesses listed in the report, are former or current military personnel who reside in Australia. We conclude that the defendants' presentation of this information to the trial court was sufficient

to meet the minimum standard for placing a trial court on notice that there are "crucial witnesses [who would be] located beyond the reach of compulsory process . . . ." *Piper Aircraft Co.* v. *Reyno*, supra, 454 U.S. 258.

The facts of this case distinguish it from *Picketts* v. *International Playtex, Inc.*, supra, 215 Conn. 490. In *Picketts*, the plaintiff brought an action in Connecticut to recover damages for his wife's death from toxic shock syndrome, which allegedly was caused by the defendants' defectively designed tampon. Id., 491. The defendants, in support of their motion to dismiss on the ground of forum non conveniens, submitted an affidavit from only one physician, who stated that he could not conclusively determine that the defendants' product was the cause of death. Id., 510. The defendants in *Picketts* did not present affidavits from the attending physicians in Canada, where the decedent was treated unsuccessfully for toxic shock syndrome, to show that they were unavailable to testify in Connecticut. Id., 510–11.

It is undisputed that, if the present case were to be tried in Connecticut, the parties would be unable to compel the attendance of unwilling, nonparty witnesses located in Australia. Cf. *Pain* v. *United Technologies Corp.*, supra, 637 F.2d 787 n.57. On the other hand, should the case be tried in Australia, the defendants all have entered into a stipulation pursuant to which they will "make their personnel and records available [to the plaintiffs] for litigation in Australia . . . ."[17] In addition, as we previously noted, pretrial discovery procedures are available under Queensland civil procedure rules.[18]

---

[17] See footnote 15 of this opinion.

[18] While the dissent concedes that depositions are available in Queensland, it maintains, on the basis of an affidavit from the plaintiffs' expert witness, John Anthony Griffin, that depositions "are not routine." Footnote 7 of the dissenting opinion. The defendants, of course, submitted an affidavit from their own expert, Patrick Anthony Keane, a Queen's Counsel and a Solicitor-General for the State of Queensland, whose opinion, not surprisingly, differed

The trial court concluded that "[t]he defendants [did] not sufficiently [establish] that the key witnesses to the case would be unavailable for trial in Connecticut," and, thus, that "there is no evidence indicating that the difficulties and costs that the defendant[s] may experience in transporting documentary evidence and in compelling unwilling witnesses to testify in Connecticut would be any greater than the difficulties and costs the plaintiffs may experience if litigation occurred in . . . [Australia]." (Internal quotation marks omitted.) The trial court apparently relied on the notion, as stated in its memorandum of decision, that "[i]t is difficult to

from that of the plaintiffs' expert regarding the extent to which the plaintiffs would be able to conduct pretrial discovery. Keane stated that, under Queensland rules of civil procedure, the plaintiffs would "probably succeed" in obtaining depositions of witnesses. Furthermore, Keane indicated that the Queensland rules of civil procedure would enable the plaintiffs to obtain relevant documents, interrogatories and evidence overseas. In light of these conflicting opinions, we are reluctant, as the trial court apparently was, to accord significant weight to the contentions of either party regarding the operation of pretrial discovery rules in Queensland.

The dissent suggests that, based on the difference in language between Queensl. Civ. P. r396 and Practice Book §§ 13-27 through 13-32 and 40-44 through 40-58, obtaining depositions is less likely in Australia than in Connecticut. See footnote 7 of the dissenting opinion and accompanying text. We note, however, that the language of the relevant Australian and Connecticut rules is substantially the same. Compare Queensl. Civ. P. r396 ("[t]he court may, for obtaining evidence for use in a proceeding, order the examination on oath of a person before a judge, magistrate or another person appointed by the court as an examiner") with Practice Book § 13-26 ("any party who has appeared in any civil action . . . where the judicial authority finds it reasonably probable that evidence outside the record will be required, may . . . take the testimony of any person, including a party, by deposition upon oral examination"). The difference is that, in Queensland, a party must secure a court order to conduct depositions whereas, in Connecticut, as a practical matter, a court order generally is not required. See generally Practice Book §§ 13-26 through 13-28.

Notwithstanding the issue of pretrial discovery, it remains undisputed that the defendants cannot compel important witnesses to *testify at trial*. Without several key witnesses at trial, who are beyond the compulsory process of Connecticut, we conclude that it would be unfair to require the defendants to establish their defense via videotaped depositions or by reading the transcripts of depositions into the record.

imagine after *Picketts* that [the] granting of a forum non conveniens motion would ever be sustained, particularly in light of the [Connecticut] Supreme Court's reference to modern technological innovations such as . . . airplanes, satellites and videotaped depositions." (Internal quotation marks omitted.)

We conclude that, because the defendants established that crucial witnesses will be unavailable if the action remains in Connecticut, and because the balance of hardships regarding access to evidence appears to favor neither forum, the trial court abused its discretion in concluding that, together, these factors did not favor dismissal. We emphasize that *Picketts* should not be read to support the proposition that technology has replaced the need for personal attendance of witnesses. To be sure, in *Picketts*, we did note that "the advent of . . . videotaped deposition[s] [has] greatly transformed the meaning of 'compulsory process' in a forum non conveniens calculus." *Picketts* v. *International Playtex, Inc.*, supra, 215 Conn. 511. Nevertheless, we did conclude in *Picketts* that, when "litigants cannot compel personal attendance and [are thus] forced to try their cases on deposition, [this situation] create[s] a condition not satisfactory to the court, jury or most litigants . . . ." (Citation omitted; internal quotation marks omitted.) Id.

In addressing the possibility of viewing the accident scene if appropriate, we examine the record to determine if this factor favors dismissal. The trial court concluded that " 'videotapes, pictures, diagrams, schematics and models' " would be more instructive than a view of the actual accident scene. To the contrary, a careful review of the board's report reveals that this accident occurred in a mountainous region of Australia used for training by the Australian Army, in a location where the topography affected the performance of the aircrews and the flight patterns of the

helicopters. Indeed, the board found that the military personnel responsible for coordinating and planning the training exercise had diagramed the terrain incorrectly. In addition, the particular lighting in the area at the time of day at which the collision occurred apparently played a role in the collision. Our review of the board's report reveals that viewing the accident scene is a factor that favors dismissal. We conclude that the trial court improperly gave no weight to this factor.

Another factor is the enforceability in the United States of a judgment rendered in Australia. The trial court did not address this factor. Nevertheless, the defendants have jointly stipulated that they will adhere to and abide by any judgment rendered in an Australian forum. We, therefore, conclude that the enforceability of a judgment rendered in an Australian forum, a factor that the trial court failed to consider, does not weigh against dismissal.

The next factor, namely, the relative advantages and obstacles to a fair trial, encompasses the defendants' ability to implead third parties. The trial court acknowledged that the defendants would be unable to implead third parties if the case were to remain in Connecticut, and that this inability would create difficulty for the defendants. The trial court concluded, however, that, "[d]espite the defendants' inability to implead other defendants, the private interest factors favor Connecticut as a forum." This court has made it clear that, even when a factor is insufficient, by itself, to outweigh a plaintiff's choice of forum, that factor is not irrelevant. *Union Carbide Corp.* v. *Aetna Casualty & Surety Co.,* supra, 212 Conn. 322. Other courts have called the inability to implead third party defendants a "major factor . . . militating in favor of dismissal . . . ." *Pain* v. *United Technologies Corp.,* supra, 637 F.2d 790.

In the present case, it is undisputed that the defendants cannot implead the Australian government or the

Australian Army as third parties if this action remains in Connecticut. Furthermore, the dissent's suggestion that "the defendants could pursue a separate indemnification action against the crew and pilots in the courts of Australia" is not feasible. Such a circumstance—holding one trial in Connecticut and another in Australia—would not only impose greater costs and inconvenience on the parties but also would make settlement impossible. We, therefore, conclude that the inability to implead third parties is a factor that, under the circumstances of this case, weighs significantly in favor of dismissal.[19]

The final private interest factor includes all other practical problems that make trial of a case easy, expeditious and inexpensive. The trial court did not consider this factor. Some courts have dismissed cases on the ground of forum non conveniens when dealing with actions involving airplane or helicopter accidents in foreign countries that are brought in the United States by plaintiffs that are foreign to the jurisdiction. See, e.g., *Piper Aircraft Co.* v. *Reyno*, supra, 454 U.S. 238; *Pain* v. *United Technologies Corp.*, supra, 637 F.2d 779–80; *Dahl* v. *United Technologies Corp.*, 632 F.2d 1027, 1028 (3d Cir. 1980). In *Pain* and *Dahl*, governmental agencies of the countries in which the accidents had occurred conducted investigations into the nature and causes of the accidents. *Pain* v. *United Technologies Corp.*, supra, 779; *Dahl* v. *United Technologies Corp.*, supra, 1030. In those cases, dismissals were premised upon the ready availability of evidence gathered as a result of the investigations and witnesses being located in the alternate forum, as well as the inconvenience of

---

[19] We note that it is undisputed that the Australian government does not benefit from the doctrine of sovereign immunity and, thus, is subject to being sued in Australia. See generally *Groves* v. *Australia*, 40 A.L.R. 193, 197, 199 (Austl. 1982) (plaintiff could recover compensatory damages from Australian government for negligence of military personnel).

conducting the trial in the United States. See *Pain* v. *United Technologies Corp.*, supra, 786–88; *Dahl* v. *United Technologies Corp.*, supra, 1031. In the present case, the board's extremely thorough findings, which derived from over 7000 pages of records and transcripts of interviews with 144 witnesses, were based on evidence located in Australia. We, therefore, conclude that this factor, which the trial court failed to consider, also favors dismissal.

The trial court concluded that the defendants' hardships did not outweigh the plaintiffs' choice of forum. We conclude, however, that the trial court afforded too much deference to the plaintiffs' preference and failed to balance the combination of private interest factors favoring dismissal against the plaintiffs' preference. Considering all of the private interest factors together—particularly, the unavailability of important evidence and several key witnesses and the defendants' inability to implead other parties—and including the factors that the trial court failed to consider, we conclude that the defendants would face substantial hardships if the action were to remain in Connecticut, and that those hardships outweigh the diminished presumption in favor of the foreign plaintiffs' choice of forum, especially in light of the defendants' stipulations as to discovery and jurisdiction.[20] Accordingly, we conclude that the trial court abused its discretion in denying the defendants' motions to dismiss on the ground of forum non conveniens.

II

As an alternate ground for affirmance, the plaintiffs also claim that the trial court improperly concluded that the motions to dismiss filed by three of the defendants, namely, Hoffman Engineering Corporation, Raytheon

---

[20] See footnote 23 of this opinion.

Optical Systems, Inc., and Gentex Corporation, did not invoke Practice Book § 10-30[21] or § 10-32.[22] We disagree.

In opposition to the defendants' motions to dismiss, the plaintiffs, citing Practice Book §§ 10-30 and 10-32, argued that the defendants were required to file all motions to dismiss within thirty days of filing their appearances. The trial court concluded that Practice Book §§ 10-30 and 10-32 were not applicable to these motions because a motion to dismiss on the ground of the common-law doctrine of forum non conveniens "does not contest the court's jurisdiction, venue or [sufficiency] of process within the meaning of [Practice Book §§] 10-30 and 10-32 . . . ." (Internal quotation marks omitted.)

We agree with the trial court's conclusion that Practice Book §§ 10-30 and 10-32 are inapplicable to motions to dismiss on the ground of forum non conveniens because such a motion does not contest the court's jurisdiction. See, e.g., *Union Carbide Corp.* v. *Aetna Casualty & Surety Co.*, supra, 212 Conn. 314. A court that decides to dismiss a case on the ground of forum non conveniens has jurisdiction but elects to dismiss the case and defer to another forum. Id.; see also *Gulf Oil Corp.* v. *Gilbert,* supra, 330 U.S. 507 ("[t]he principle of forum non conveniens is simply that a court may resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute"). We, therefore, conclude that the trial court properly determined that the motions to dismiss filed by Hoffman Engineering Corporation, Raytheon Optical Systems, Inc., and Gentex Corporation did not invoke Practice Book § 10-30 or § 10-32.

The decision is reversed and the case is remanded to the trial court with direction to grant the defendants'

[21] See footnote 9 of this opinion for the text of Practice Book § 10-30.

[22] See footnote 10 of this opinion for the text of Practice Book § 10-32.

motions to dismiss on the ground of forum non conveniens, subject to the conditions[23] agreed upon by the defendants.

In this opinion SULLIVAN, C. J., and BORDEN, NORCOTT, PALMER and VERTEFEUILLE, Js., concurred.

KATZ, J., dissenting. I agree with the majority that the doctrine of forum non conveniens remains a viable part of the common law of Connecticut.[1] I disagree, however, with its determination that the trial court improperly applied the doctrine in this case.

## I

"To prevail on a forum non conveniens motion to dismiss, the defendant must show as a threshold matter that an adequate alternative forum exists.[2] See *Pere-*

[23] The defendants agreed to: "(1) consent to jurisdiction in Australia; (2) accept service of process in connection with an action in Australia; (3) make their personnel and records available for litigation in Australia; (4) waive any applicable statutes of limitation in Australia up to six months from the date of dismissal of this action or for such other reasonable time as may be required as a condition of dismissing this action; (5) satisfy any judgment that may be entered against them in Australia; and (6) consent to the reopening of the action in Connecticut in the event the above conditions are not met as to any proper defendant in this action."

[1] Rather than argue that the trial court abused its discretion in its application of the doctrine of forum non conveniens, the defendants argued that the trial court abused its discretion by *failing* to apply the doctrine. Specifically, the defendants claim that the trial court held that, "regardless of the facts presented by [the] defendants, the doctrine of forum non conveniens can never be properly invoked." As the majority aptly appreciates, the trial court unequivocally recognized the vitality of the doctrine.

[2] Although the threshold question in the forum non conveniens inquiry is whether an adequate alternative forum exists, on rare occasions, the remedy available in the alternative forum may be so unsatisfactory as to render the forum inadequate. "The mere fact that the foreign and home fora have different laws does not ordinarily make the foreign forum inadequate. To the contrary, 'dismissal may not be barred solely because of the possibility of an unfavorable change in law.' *Piper Aircraft [Co.* v. *Reyno]*, 454 U.S. [235, 249, 102 S. Ct. 252, 70 L. Ed. 2d 419 (1981)]; accord *Alfadda* v. *Fenn*, 159 F.3d [41, 45 (2d Cir. 1998)] ('That the law of the foreign forum differs from American law should ordinarily not be given conclusive or even substantial weight in assessing the adequacy of the forum.'). Even if particular causes of action or certain desirable remedies are not available in the foreign forum,

*grine Myanmar Ltd.* v. *Segal*, 89 F.3d 41, 46 (2d Cir. 1996). A defendant must next demonstrate that the ordinarily strong presumption favoring the plaintiff's chosen forum is countered by the private and public interest factors set out in [*Gulf Oil Corp.* v. *Gilbert*, 330 U.S. 501, 508–509, 67 S. Ct. 839, 91 L. Ed. 1055 (1947)], which weigh so heavily in favor of the foreign forum that they overcome the presumption for [the plaintiff's] choice of forum. *Gilbert* directs that 'unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed,' [id., 508] . . . . The burden of proof to demonstrate that the forum is not convenient is on [the] defendant seeking dismissal. See *PT United Can Co.* v. *Crown Cork & Seal Co.*, 138 F.3d 65, 74 (2d Cir. 1998)." (Citations omitted.) *DiRienzo* v. *Philip Services Corp.*, 232 F.3d 49, 56–57 (2d Cir. 2000).

---

that forum will usually be adequate so long as it permits litigation of the subject matter of the dispute, provides adequate procedural safeguards and the remedy available in the alternative forum is not so inadequate as to amount to no remedy at all. See *Piper Aircraft* [*Co.* v. *Reyno*, supra, 254–55 and n.22]; *PT United* [*Can Co.* v. *Crown Cork & Seal Co.*], 138 F.3d [65, 73, 74–75 (2d Cir. 1998)] (Indonesia adequate forum despite unavailability of [Racketeer Influenced and Corrupt Organizations (RICO)] causes of action); see also, e.g., *Capital Currency Exch., N.V.* v. *National Westminster Bank PLC*, 155 F.3d 603, 609–11 (2d Cir. 1998), cert. denied, 526 U.S. 1067, 119 S. Ct. 1459, 143 L. Ed. 2d 545 (1999) (England adequate forum despite unavailability of Sherman Act and certain common law claims, and despite fact that English courts never had awarded money damages in antitrust case); *Murray* v. *British Broad. Corp.*, 81 F.3d 287, 292–93 (2d Cir. 1996) (England adequate forum despite plaintiff's claim that American contingency fee system was only way he could afford a lawyer); *Transunion Corp.* v. *PepsiCo, Inc.*, 811 F.2d 127, 129 (2d Cir. 1987) (per curiam) (dismissing in favor of Philippines forum despite unavailability of RICO causes of action and treble damages); *Alcoa Steamship Co.* v. *M/V Nordic Regent*, 654 F.2d 147, 159 (2d Cir. 1980) ([en] banc) (dismissing in favor of Trinidad forum despite likelihood that plaintiff, who potentially could recover $8 million in United States, was limited to $570,000 in Trinidad); *Howe* v. *Goldcorp Investments, Ltd.*, 946 F.2d 944, 952 (1st Cir. 1991) (dismissing securities fraud case in favor of Ontario forum despite some differences in law)." *DiRienzo* v. *Philip Services Corp.*, 232 F.3d 49, 57–58 (2d Cir. 2000).

"Because much of the doctrine's strength derives from its flexibility and each case turns on its own facts, a single factor is rarely dispositive." Id., 57. Rather, there exists a list of considerations to be balanced, which is by no means exhaustive, and some factors may not be relevant in the context of a particular case. The trial court must weigh "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling . . . witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Gulf Oil Corp.* v. *Gilbert*, supra, 330 U.S. 508. To examine "the relative ease of access to sources of proof" and the availability of witnesses, the court must scrutinize the substance of the dispute between the parties to evaluate what proof is required, and determine whether the pieces of evidence cited by the parties are critical, or even relevant, to the plaintiff's cause of action and to any potential defenses to the action. Id. Public interest factors relevant to a forum non conveniens determination, such as the "local interest in having localized controversies decided at home" and the interest in having "the trial of a diversity case in a forum that is at home with the state law that must govern the case"; id., 509; also thrust the trial court into the merits of the underlying dispute, requiring consideration of the locus of the alleged culpable conduct and the connection of that conduct to the plaintiff's chosen forum. Cf. *Piper Aircraft Co.* v. *Reyno*, 454 U.S. 235, 259–60, 102 S. Ct. 252, 70 L. Ed. 2d 419 (1981); see also *Van Cauwenberghe* v. *Biard*, 486 U.S. 517, 528, 108 S. Ct. 1945, 100 L. Ed. 2d 517 (1988) ("in assessing a forum non conveniens motion, the district court generally becomes entangled in the merits of the underlying dispute").

Finally, it is worth noting that, in our application of the abuse of discretion standard, disagreement with the

trial court as if the facts had been presented to this court in the first instance cannot be the basis of our decision. "Meaningful review, even from this circumscribed perspective, nonetheless encompasses a determination whether the trial court abused its discretion as to either the facts or the law." *Picketts* v. *International Playtex, Inc.*, 215 Conn. 490, 500, 576 A.2d 518 (1990). Therefore, the deference accorded to the trial court's discretion presupposes that the court used the correct standards prescribed by the governing rule of law. See *Guidi* v. *Inter-Continental Hotels Corp.*, 224 F.3d 142, 145 (2d Cir. 2000), citing *R. Maganlal & Co.* v. *M.G. Chemical Co.*, 942 F.2d 164, 167 (2d Cir. 1991).

It bears repeating, however, that emphasis on the trial court's discretion does not overshadow the central principle of the forum non conveniens doctrine that "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gulf Oil Corp.* v. *Gilbert*, supra, 330 U.S. 508. "[I]nvocation of the doctrine of forum non conveniens is a drastic remedy . . . [to be] approach[ed] with caution and restraint." (Citation omitted; internal quotation marks omitted.) *Picketts* v. *International Playtex, Inc.*, supra, 215 Conn. 501. The trial court does "not have unchecked discretion to dismiss cases from a plaintiff's chosen forum simply because another forum, in the court's view, may be superior to that chosen by the plaintiff." *Pain* v. *United Technologies Corp.*, 637 F.2d 775, 783 (D.C. Cir. 1980), cert. denied, 454 U.S. 1128, 102 S. Ct. 980, 71 L. Ed. 2d 116 (1981). In applying the doctrine of forum non conveniens, the trial court "cannot exercise its discretion in order to level the playing field between the parties. The plaintiff's choice of forum, which may well have been chosen precisely because it provides the plaintiff with certain procedural or substantive advantages, should be respected unless equity weighs strongly in favor of the defendant." (Inter-

nal quotation marks omitted.) *Picketts* v. *International Playtex, Inc.*, supra, 501. In deciding a forum non conveniens motion, the trial court must evaluate "not whether some other forum might be a good one, or even a better one than the plaintiff's chosen forum . . . [but] whether [the] plaintiff's chosen forum is itself inappropriate or unfair because of the various private and public interest considerations involved." (Internal quotation marks omitted.) Id.

Accordingly, as this court has articulated previously, in exercising its structured discretion, the trial court "should place its thumb firmly on the plaintiff's side of the scale, as a representation of the strong presumption in favor of the plaintiff's chosen forum, before attempting to balance the private and public interest factors relevant to a forum non conveniens motion." Id., 502. "When . . . the plaintiffs are foreign to their chosen forum, the trial court must readjust the downward pressure of its thumb, but not remove it altogether from the plaintiffs' side of the scale. Even though the plaintiffs' preference has a diminished impact because the plaintiffs are themselves strangers to their chosen forum; *Piper Aircraft Co.* v. *Reyno*, supra, [454 U.S.] 256; Connecticut continues to have a responsibility to those foreign plaintiffs who properly invoke the jurisdiction of this forum; see *Carlenstolpe* v. *Merck & Co.*, [638 F. Sup. 901, 904 (S.D.N.Y. 1986), appeal dismissed, 819 F.2d 33 (2d Cir. 1987)]; especially in the somewhat unusual [situation wherein] it is the forum resident who seeks dismissal. . . . Where a corporation is actually carrying on business in the state and the plaintiffs make an offer of proof concerning the defendant's in-state activities which supports the allegations that the tortious conduct occurred in the state, the corporate connection with the state is more than tenuous, and weighs against dismissal. . . . While the weight to be given to the choice of a domestic forum by foreign plaintiffs

is diminished, their entitlement to a preference does not disappear entirely. The defendants challenging the propriety of this choice continue to bear the burden to demonstrate why the presumption in favor of [the] plaintiff[s'] choice, weakened though it may be, should be disturbed." (Citations omitted; internal quotation marks omitted.) *Picketts* v. *International Playtex, Inc.*, supra, 215 Conn. 502; see also *Union Carbide Corp.* v. *Aetna Casualty & Surety Co.*, 212 Conn. 311, 318, 562 A.2d 15 (1989) (upholding trial court's determination that, despite corporate presence of plaintiff in this state, Connecticut was inconvenient forum for declaratory judgment action that involved toxic waste disposal activities at various sites throughout country and Commonwealth of Puerto Rico).

## II

In the present case, in deciding the defendants' motions to dismiss, the trial court relied on *Picketts* v. *International Playtex, Inc.*, supra, 215 Conn. 501, and appropriately recognized that proper application of the doctrine of forum non conveniens required it to engage in a four step process. Accordingly, the trial court first examined whether the defendants were amenable to process in Australia. Because the defendants had agreed to submit to the jurisdiction of the Australian courts if the trial court were to dismiss the present action for forum non conveniens, the trial court concluded that the defendants were indeed amenable to process in Australia. Nevertheless, the trial court evaluated the alleged procedural and substantive differences—in particular, the high cost of prosecuting the case to trial and the lack of contingency fee agreements in Australia that would make it very difficult to retain competent counsel—that could make Australia an inadequate forum. The trial court cited *Murray* v. *British Broadcasting Corp.*, 81 F.3d 287, 292 (2d Cir. 1996) ("[b]alancing the plaintiff's financial burdens as one of

several relevant factors serves the 'repeatedly emphasized . . . need to retain flexibility' in the application of the forum non conveniens doctrine") and *Capital Currency Exchange, N.V.* v. *National Westminster Bank, PLC*, 155 F.3d 603, 610 (2d Cir. 1998), cert. denied, 526 U.S. 1067, 119 S. Ct. 1459, 143 L. Ed. 2d 545 (1999) (holding unavailability of additional monetary damages fails to render forum inadequate), and rejected the alleged lack of monetary compensation available to the plaintiffs as a basis upon which to conclude that Australia was an inadequate forum.

Following its conclusion concerning the first step in the analysis, which resulted in its determination that Australia was an adequate forum, the trial court then embarked on the second stage of the inquiry. Citing *Picketts* v. *International Playtex, Inc.*, supra, 215 Conn. 501–502, the trial court understood its responsibility to balance the private and public interest factors relevant to a forum non conveniens claim.[3] Although the trial court began, in accordance with *Picketts*, generally with a thumb firmly placed on the plaintiffs' side of the scale as a representation of the strong presumption in favor of the plaintiffs' chosen forum, it recognized that, because the plaintiffs were foreign to their chosen forum, their preference had a diminished impact, and the court therefore "readjust[ed] the downward pressure of its thumb . . . ." Id., 502. Although the pressure is lessened, the court's proverbial thumb remains on the scale until the defendants push it off. See id.; see also *Reid-Walen* v. *Hansen*, 933 F.2d 1390, 1394 (8th Cir. 1991). Finally, the positioning of the thumb must occur, as it did in the present case, prior to the balancing

---

[3] The trial court found that the public interest factors favored Australia as the appropriate forum. The plaintiffs do not challenge that finding. Therefore, that aspect of the balancing test is not at issue in this appeal. Whether that public interest warrants removal of the action from the plaintiffs' chosen forum, however, is another issue—one that the trial court expressly rejected.

of the private and public interest factors relevant to a forum non conveniens motion. *Piper Aircraft Co.* v. *Reyno*, supra, 454 U.S. 261; *Picketts* v. *International Playtex, Inc.*, supra, 513.

I disagree with the defendants' claim that the trial court "refused to grant weight to any factor other than the plaintiffs' choice of forum." I similarly disagree with the majority's conclusion that the trial court "failed to balance the combination of private interest factors . . . against the plaintiffs' preference." To the contrary, the trial court proceeded to evaluate six of the private interest factors to decide whether they favored Connecticut as a forum.[4] It was only after thoughtful consideration of each of those factors that the trial court concluded that the defendants had not met their burden to show that the case filed in Connecticut should have been dismissed on forum non conveniens grounds. Although the trial court analyzed each private factor individually, it determined, on balance, that "the private interest factors favor Connecticut as a forum."

Turning to the issue of access, the trial court began with the complaint in this case wherein the plaintiffs sued seven different manufacturers for products liability under General Statutes § 52-572n et seq. and punitive damages pursuant to General Statutes § 52-240b. To prevail in such an action, the plaintiffs must prove that the products were defective and that these defects were a substantial factor in causing the subject crash. *Haesche* v. *Kissner*, 229 Conn. 213, 218, 640 A.2d 89

---

[4] Specifically, the trial court, quoting *Miller* v. *United Technologies Corp.*, 40 Conn. Sup. 457, 463, 515 A.2d 390 (1986), identified the following private interest factors: " '(1) the relative ease of access to sources of proof; (2) the availability of compulsory process for attendance of unwilling witnesses, and the cost of obtaining attendance of willing witnesses; (3) the possibility of viewing the accident scene if such viewing is appropriate to the action; (4) the enforceability of a judgment; (5) the relative advantages and obstacles to [a] fair trial; and (6) all other practical problems that make trial of a case easy, expeditious and inexpensive.' "

(1994). The plaintiffs brought claims against corporations located in the United States and argued that documentary evidence regarding the design, manufacture, testing and sale of the night vision goggles as well as the Black Hawk helicopters is located in the United States. Similarly, the plaintiffs claim that all persons involved in the design, manufacture and sale of the equipment are also located in the United States.[5] Although the defendants represented to the trial court that they will provide in Australia the discoverable, nonprivileged documents that may be relevant and that they may produce certain witnesses within their control, the trial court reasonably identified two potential problems that could not be answered to its satisfaction: (1) as this court recognized in *Picketts*, there still could remain an enforcement issue following dismissal by the court; see *Picketts* v. *International Playtex, Inc.*, supra, 215 Conn. 499 n.11;[6] and (2) the representation by the defendants did not address the issue of what access the plaintiffs could have to witnesses and evidence that never were under the defendants' control, as in the case of the military, or are no longer subject to the defendants' control, as in the case of former employees.

The trial court heard argument that, were the case to be removed to Australia, discovery of the evidence

[5] Although the plaintiffs did not provide specific material supporting these allegations, the defendants have not contested their claims. I would conclude, consistent with forum non conveniens analysis, that it was incumbent for the defendants to challenge that issue, as well as to focus on the issue of causation. Because they did not do so, I, like the trial court, take the plaintiffs' claims at face value.

[6] The defendants complain that the trial court too quickly relied on this court's warning about the potential enforcement problems. See *Picketts* v. *International Playtex, Inc.*, supra, 215 Conn. 499 n.11. The defendants contend in their brief that the trial court could have retained limited jurisdiction over the case in the event that the defendants did not honor their limited and conditioned offer. This suggestion, if indeed it were to have any teeth, raises more questions than it answers. What *meaningful* leverage would a Connecticut trial court have over litigation taking place in a foreign jurisdiction?

crucial to this products liability action would be beyond the plaintiffs' reach. According to an affidavit submitted by John Anthony Griffin, Queen's Counsel in the state of Queensland, Australia (Griffin affidavit), discovery rules in Australia do not *routinely* provide for depositions,[7] they limit written interrogatories to no more than thirty questions, and they provide no means for compelling discovery from a nonparty who is not able to be served in Australia.[8] Although the defendants agreed

---

[7] Although depositions are recognized in Australia, they are not routine. Contrast Australian Uniform Civil Procedure Rules r396; see footnote 6 of the majority opinion; with Practice Book §§ 13-27 through 13-32, and §§ 40-44 through 40-58.

[8] The affidavit, in which Griffin addressed the reasons that the plaintiffs' ability to prosecute their claims would be severely limited if the proceedings were moved to Australia, provides in relevant part: "John Anthony Griffin . . . Queen's Counsel, being duly sworn, deposes and says as follows . . .

"Procedural

"3. Conduct of proceedings in the Queensland Supreme Court is governed by the *Uniform Civil Procedure Rules* (UCPR) which were promulgated pursuant to the Supreme Court Act, 1991 in July, 1999.

"4. The UCPR enforces strict limits on a party's ability to obtain discovery from an adverse party. The obligation to provide documentary discovery (known as 'disclosure') is discharged by:

"(a) delivering to an opposing party or parties a list of the documents in the possession or under the control of the disclosing party which are 'directly relevant to the allegation in issue' (a 'list of documents'); and

"(b) at the opposing party's request, delivering to that party copies of the documents mentioned in the list of documents, other than the documents in relation to which legal professional privilege is claimed.

"Formerly, it was the case that all documents were discoverable that would lead the other party to a 'train of inquiry.' However under the UCPR, the duty of disclosure applies only to each document in the possession or under the control of the disclosing party which is directly relevant to an allegation in issue in the pleadings.

"5. Under the UCPR, interrogatories may only be delivered to a party to the proceeding with the court's leave. The number of interrogatories is ordinarily limited to 30 where each distinct question is considered to be one interrogatory.

"6. There is a mechanism for compelling a non-party to provide disclosure. A notice of non-party disclosure must be served in the same way as a claim. In the case of a non-party who is outside the jurisdiction of the court, whether or not such foreign non-party chooses to comply with the notice is dependent upon he, she or it being voluntarily prepared to do so.

among themselves that they would make their records and personnel available for the litigation were it to take place in Australia, this stipulation left the plaintiffs essentially dependent on the "kindness"[9] of their adversaries as a means of gathering information with which to develop their case. This agreement, over which the

"7. The consequence of these limits on the discovery process would be to severely impact upon the ability of the plaintiffs in this action to search out evidence which may be helpful or which may be essential to the proof of the case unless such evidence and documents are within the possession or power of a party to the action who has stipulated to the jurisdiction or are voluntarily produced by others.

"8. There is no provision in Queensland for a system of discovery by deposition. There is no entitlement or mechanism to compel a witness to submit to any form of oral examination prior to trial. There is no entitlement or mechanism to compel a witness to submit to any form of written interrogation prior to trial. There is no mechanism whereby a party or non-party can be orally examined as to the identity, location or content of documents relevant to the proceedings.

"9. In this instance, I envisage that many relevant persons not party to the proceedings would reside in the United States. These would include former employees of the defendant[s], consultants, parts suppliers and experts who have provided services and given opinions to the various defendants. In the Queensland proceedings these persons would not be obliged to comply with a notice requiring non-party disclosure. These persons, despite having knowledge touching on the issues in the case and who could assist the plaintiffs in prosecuting their case, could not be compelled to disclose documents.

"10. While there is a process in the UCPR enabling judges to order that the evidence of a witness be taken by deposition, depositions are not a pre-trial discovery method which is used here. Therefore, if the case was to be tried in Queensland, no depositions of witnesses could be expected [to] take place. However, since depositions are available under the Rules with the court's leave and are therefore not incompatible with Queensland procedure or law, a Queensland court would have the basis for honouring an American court's request that depositions be taken here as part of pre-trial discovery in an American law suit.

"11. The consequence of these limits on the discovery process would be to severely impact upon the ability of the plaintiffs in this action to search out evidence which may be helpful or may be essential to the proof of the case unless such evidence and documents are within the possession or power of a party to the action who has stipulated to the jurisdiction or are voluntarily produced by others. . . ."

[9] The "kindness of strangers"; T. Williams, A Streetcar Named Desire (1947) sc. 11; as we know, is often not dependable.

court had no authority, hardly acts as a basis upon which the trial court was required to conclude that the defendants had demonstrated that private interests weighed strongly in their favor.

The defendants contend that, as evidenced by the detailed report issued by the Black Hawk Board of Inquiry (board) charged with investigating the crash, the numerous diagrams of the flight track and helicopter formations, photographs of the wreckage, the flight track and the crash site, crash witness notes and statements, affidavits, helicopter operator and maintenance records, pilot log books, and medical, employment and financial records of the deceased and injured survivors of the crash are all located in Australia. The defendants argue that Connecticut law does not give them "the power to require any of those [persons] in possession of this evidence to make copies for each party and ship them to Connecticut." Although the defendants recognize that they may conceivably obtain access to these sources of proof by international treaty or otherwise, they criticize the process as expensive and burdensome. "The defendants would have to retain Australian counsel, in addition to the counsel already necessary in Connecticut . . . ."

In response, the plaintiffs submitted affidavits to the trial court evidencing that Connecticut litigants may indeed obtain documents and depositions in Australia because both the United States and Australia are signatories to the Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, opened for signature March 18, 1970, 23 U.S.T. 2555, T.I.A.S. No. 7444 (Hague Convention). See also footnote 8 of this dissent (paragraph ten of Griffin affidavit, discussing availability of depositions under Australian rules). Article 9 of the Hague Convention provides in relevant part: "The judicial authority which executes a Letter of Request shall apply its own law as to the methods and proce-

dures to be followed. However, it will follow a request of the requesting authority [Connecticut] that a special method or procedure [i.e., depositions] be followed, unless this is incompatible with the internal law of the State of execution [Australia] or is impossible of performance by reason of its internal practice and procedure or by reason of practical difficulties." Similarly, under article 21 (d) of the Hague Convention,[10] "the evidence may be taken in the manner provided by the law applicable to the court in which the action is pending provided that such manner is not forbidden by the law of the State where the evidence is taken . . . ." Our rules of practice, specifically, Practice Book § 13-21, explicitly permit such discovery to be taken in a foreign country as long as that discovery is permitted by an "applicable treaty or convention . . . ." Therefore, if the case were to remain in Connecticut, the defendants would, in all likelihood, be able to obtain discovery of documents and obtain statements of witnesses in Australia using Connecticut discovery methods.[11] See footnote 8 of this

[10] Article 21 of the Hague Convention provides: "Where a diplomatic officer, consular agent or commissioner is authorized under Articles 15, 16 or 17 to take evidence—

"(a) he may take all kinds of evidence which are not incompatible with the law of the State where the evidence is taken or contrary to any permission granted pursuant to the above Articles, and shall have power within such limits to administer an oath or take an affirmation;

"(b) a request to a person to appear or to give evidence shall, unless the recipient is a national of the State where the action is pending, be drawn up in the language of the place where the evidence is taken or be accompanied by a translation into such language;

"(c) the request shall inform the person that he may be legally represented and, in any State that has not filed a declaration under Article 18, shall also inform him that he is not compelled to appear or to give evidence;

"(d) the evidence may be taken in the manner provided by the law applicable to the court in which the action is pending provided that such manner is not forbidden by the law of the State where the evidence is taken;

"(e) a person requested to give evidence may invoke the privileges and duties to refuse to give the evidence contained in Article 11."

[11] I am, of course, aware that the government of Australia has declared that, pursuant to article 23 of the Hague Convention, it will not execute letters of request issued in an effort to obtain pretrial document discovery.

dissent (paragraph ten of Griffin affidavit, attesting that

I disagree, however, with the significance that the majority places on this reservation. First, the reservation applies only to *letters of request* for *documents*. "Thus, an Article 23 reservation affects neither the most commonly used informal Convention procedures for [the] taking of evidence by a consul or a commissioner nor formal requests for depositions or interrogatories." *Societe Nationale Industrielle Aeropatiale* v. *United States District Court*, 482 U.S. 522, 563, 107 S. Ct. 2542, 96 L. Ed. 2d 461 (1987) (Blackmun, J., concurring in part, dissenting in part); see also *In re Anschuetz & Co., GmbH*, 754 F.2d 602, 612 (5th Cir. 1985), vacated on other grounds sub nom. *Anschuetz & Co., GmbH* v. *Mississippi River Bridge Authority*, 483 U.S. 1002, 107 S. Ct. 3223, 97 L. Ed. 2d 730 (1987) (although article 23 "allows states to limit the scope of evidence taking for which they will employ their compulsory powers on behalf of foreign courts . . . it does not give foreign authorities the significant prerogative of determining how much discovery may be taken from their nationals who are litigants before American courts"); *Hudson* v. *Hermann Pfauter GmbH & Co.*, 117 F.R.D. 33, 39 (N.D.N.Y. 1987) (article 23 does not seem to affect discovery involving answers to interrogatories, and may not foreclose taking of evidence by duly appointed commissioner); *Philadelphia Gear Corp.* v. *American Pfauter Corp.*, 100 F.R.D. 58, 61 (E.D. Pa. 1983) (article 23 "is tempered by Article 9" requiring signatories "to implement in good faith any legitimate discovery procedure requested by" foreign court). "Second, although Article 23 refers broadly to 'pretrial discovery,' the intended meaning appears to have been much narrower than the normal United States usage." *Societe Nationale Industrielle Aeropatiale* v. *United States District Court*, supra, 563 (Blackmun, J., concurring in part, dissenting in part); id., 563 n.21 ("delegates from civil-law countries revealed a 'gross misunderstanding' of the meaning of 'pretrial discovery,' thinking that it is something used before the *institution* of a suit to search for evidence that would lead to litigation" [emphasis in original]). "The contracting parties for the most part have modified the declarations made pursuant to Article 23 to limit their reach." Id., 563–64; see id., 564–65 (noting that "the emerging view of this exception to discovery is that it applies only to 'requests that lack sufficient specificity or that have not been reviewed for relevancy by the requesting court' ").

Indeed, although the Australian government continues to adhere to its unqualified article 23 declaration, it has drafted regulations permitting its Supreme Court to issue an order making provision for obtaining evidence, "as may be appear to be appropriate for the purpose of giving effect to the request in pursuance of which the application is made . . . ." Queensland Evidence Act of 1977, § 37 (1). That statute further provides that such an order may make provision "(a) for the examination of witnesses, either orally or in writing . . . (b) for the production of documents . . . (c) for the inspection, photographing, preservation, custody or detention of any property . . . (d) for the taking of samples of any property and the carrying out of experiments on or with any property; and (e) for the medical examina-

depositions not incompatible with Queensland procedure or law). The opposite, however, is not true. That is, Australian litigants would not be able to employ the Hague Convention to arrange depositions in the United States because depositions are not a routine part of Australian court rules. See footnote 8 of this dissent (Griffin affidavit, paragraph eight). Therefore, the trial court reasonably concluded that the difficulties and costs that the defendants might experience in being forced to try the case in Connecticut would be no greater than the difficulties and costs the plaintiffs could experience if litigation were to proceed in Australia.

The defendants also argue that the trial court improperly disregarded their claim that they would be unduly burdened by their inability to compel 144 Australian witnesses, who testified before the board, to attend a trial in Connecticut. In the summary of the board's report is a list of witnesses indicating where in the original 7000 page report, which had not been provided to the court, their actual testimony could be read. Although the summary also contains a list after each section of the report concerning the circumstances of the accident, the board's analysis and its findings, which identified by number the witness and/or exhibit substantiating the board's conclusions in each preceding paragraph, not every paragraph explained relevant testimony. Furthermore, even those paragraphs that described the actions of certain witnesses did not always contain references to relevant witness testimony, and numerous paragraphs of findings contained no references at all. The defendants did not explain to the trial court why each witness in the board's report would be necessary, and likewise failed to provide any

tion of any person." Queensland Evidence Act of 1977, § 37 (2). Thus, in practice, a reservation is not the significant obstacle to discovery under the Hague Convention sufficient to undermine the trial court's determination.

information to the trial court concerning the whereabouts of those witnesses.[12] The trial court, not surprisingly, determined that the defendants had failed to establish the necessity of all 144 witnesses at trial.

The defendants claim to have advised the trial court of the nature of their testimony and its significance. In reality, however, the defendants merely provided a list of witnesses linked to a list of conclusions drawn by the board. For example, the board's conclusions at paragraph 4.22 of its report "that no aircraft maintenance or engineering factor contributed to this accident" and that "no fault is attributed to Black Hawk aircraft for any aspect of this accident," are linked to four witnesses identified as the sources for the opinions reached. This approach required the trial court to examine each identified paragraph of the board's summary to *surmise* why the defendants would necessarily need the testimony of the particular witness and to discern how that potential testimony related to the board's conclusion in the identified paragraph. "When a dismissal is premised on the convenience of witnesses, more than a mere allegation to that effect is required. *Piper Aircraft Co.* v. *Reyno,* supra, [454 U.S.] 259 and n.27. Rather, the defendant[s] must establish, with specificity, inconvenience to witnesses that is sufficiently prejudicial to justify dismissal." (Internal quotation marks omitted.) *Picketts* v. *International Playtex, Inc.,* supra, 215 Conn. 509. The

---

[12] The majority contends that most of the 144 witnesses in the report were "former or current military personnel who reside in Australia." I recognize that, at the time that the board conducted its inquiry and compiled the report in 1996, the witnesses were members of the Australian military. Whether those witnesses were located in Australia, or whether they were still members of the Australian military at the time that the trial court denied the defendants' motion to dismiss, is far from certain. It was incumbent upon the defendants to provide the trial court with the names and locations of the witnesses in order to allow it to determine whether the alleged inconvenience to those witnesses was " 'sufficiently prejudicial to justify dismissal.' " *Picketts* v. *International Playtex, Inc.,* supra, 215 Conn. 509.

defendants' failure to provide any information regarding the witnesses' whereabouts, what evidence specifically they could provide and whether they would testify voluntarily in Connecticut left the trial court unable to conclude that the defendants had sustained their burden of proof that the purportedly unavailable witnesses were "key witnesses who need[ed] to be called and that their testimony [was] material." (Internal quotation marks omitted.) Id., 510.

The third factor—viewing the accident scene where the two helicopters finally came to rest after the crash—is hardly worth mentioning. The defendants have not demonstrated why a view of the premises would be necessary. See *Grimandi* v. *Beech Aircraft Corp.*, 512 F. Sup. 764, 779 (D. Kan. 1981) (defendants did not establish necessity of viewing premises nor was necessity apparent). To the extent the parties want to establish the physical layout of the location where the accident occurred, they could do so accurately through aerial photographs and other demonstrative evidence or testimony. Id.[13] Indeed, the accident occurred during a military exercise to practice recovering Australian citizens held hostage by armed terrorists. While a live-fire airmobile assault on a simulated terrorist position was being conducted, two helicopters collided, causing the lead helicopter to crash to the ground upside down and the second helicopter to enter a flat spin before crash landing in an upright position. Both helicopters were totally destroyed by fire. Therefore, even under the defendants' theory that negligence by the crew and pilots caused the accident, the most meaningful evidence would have to be gleaned from maps, diagrams and other items best able to demonstrate the extraordinarily complicated flying mission.

---

[13] Although the trial court did not address specifically the concerns expressed by the defendants that a jury in Connecticut could not appreciate the climatic conditions and geography of Australia, I view that as a reflection of its viewpoint of the weakness of any such argument.

Although not a specific *Gilbert* factor, the ability of defendants to bring a third party action against other alleged wrongdoers can be considered a private interest factor within the enumerated consideration of making a trial "easy, expeditious and inexpensive." *Gulf Oil Corp.* v. *Gilbert,* supra, 330 U.S. 508; see also *Piper Aircraft Co.* v. *Reyno,* supra, 454 U.S. 259 (holding that inability to implead third party defendants in federal court supported having trial in Scotland). The defendants claim that they could not implead as a third party the Australian government were the case to remain in Connecticut. Generally, the efficiency and convenience of trying all actions arising from the same incident at one time and at one place often may be a factor weighing in favor of the foreign forum where the incident occurred and the third party is located. The courts that have considered this factor, however, have required a showing of actual convenience to the parties, not mere hypothetical discussion about the efficiency of third party practice. See *Piper Aircraft Co.* v. *Reyno,* supra, 258–59; *Lehman* v. *Humphrey Cayman, Ltd.,* 713 F.2d 339, 343–44 (8th Cir. 1983), cert. denied, 464 U.S. 1042, 104 S. Ct. 708, 79 L. Ed. 2d 172 (1984); *Olympic Corp.* v. *Societe Generale,* 462 F.2d 376, 379 (2d Cir. 1972).

In the present case, the defendants claim that it was pilot and crew error that caused the crash and not the night vision goggles, the helmets, the crew's attendant gear or the helicopters. Therefore, they claim that they must be able to implead the Australian government as a third party defendant in an action for negligence. Although the trial court acknowledged that the Australian military were potential third party defendants, and that the inability to implead them was indeed a factor to be considered, the court concluded that those interests did not trump the presumption favoring the plaintiffs' choice of forum. The trial court concluded that the defendants had failed to demonstrate that their defense

would be impaired greatly without the ability to implead the crew and the pilots. Although perhaps more inconvenient, the defendants could pursue a separate indemnification action against the crew and pilots in the courts of Australia; see *Lehman* v. *Humphrey Cayman, Ltd.*, supra, 713 F.2d 344; and assert defenses against the plaintiffs' claims in Connecticut. See *Miller* v. *United Technologies Corp.*, 233 Conn. 732, 746–47, 660 A.2d 810 (1995) (government contractor defense may preclude product liability action brought by third party against suppliers of military equipment); see also *Hercules, Inc.* v. *United States*, 516 U.S. 417, 421–22, 116 S. Ct. 981, 134 L. Ed. 2d 47 (1996). Therefore, the trial court considered this factor as "diminishing" the plaintiffs' choice of forum, but not expunging it as the defendants would have preferred.

Additionally, as part of the *Gilbert* private interest analysis, courts must be sensitive to the practical problems likely to be encountered by plaintiffs in litigating their claim, especially when the alternative forum is in a foreign country. *Wilson* v. *Humphreys (Cayman) Ltd.*, 916 F.2d 1239, 1246–47 (7th Cir. 1990); *Lehman* v. *Humphrey Cayman, Ltd.*, supra, 713 F.2d 345; *Manu International, S.A.* v. *Avon Products, Inc.*, 641 F.2d 62, 67 (2d Cir. 1981); *Rudetsky* v. *O'Dowd*, 660 F. Sup. 341, 346 (E.D.N.Y. 1987). The trial court "must be alert to the realities of the plaintiff's position, financial and otherwise, and his or her ability as a practical matter to bring suit in the alternative forum." *Lehman* v. *Humphrey Cayman, Ltd.*, supra, 346. The plaintiffs contend that they will have great difficulty in retaining an attorney in Australia. This alleged inability to retain counsel in the alternative forum is an important factor counseling against dismissal. *Rudetsky* v. *O'Dowd*, supra, 347; see also *Lehman* v. *Humphrey Cayman, Ltd.*, supra, 345–46. As stated in paragraph twenty-three of the Griffin affidavit; see footnote 8 of this dissent; "[i]t is likely

that the legal costs of prosecuting the case to trial in Queensland would exceed the realistic, potential recovery should the action be successful." The cost and recovery realities in this case were legitimate factors for the trial court to consider in concluding that the plaintiffs' choice of forum deserved substantial deference.

Finally, the defendants' position is weakened by the fact that they are resident commercial companies that solicit business in the United States. Therefore, it should not come as a total surprise to them that they could be sued for products liability in the courts of this country.

The only factor that the trial court did not discuss expressly is the enforceability of the judgment. The defendants stipulated that they would abide by any judgment rendered by the Australian courts. In the absence of any evidence allowing it to conclude otherwise, I assume that the trial court found that to be the case. Nevertheless, that factor did not compel a contrary decision on the ultimate issue, that is, "whether [the] plaintiffs' chosen forum is itself inappropriate or unfair . . . ." (Internal quotation marks omitted.) *Picketts* v. *International Playtex, Inc.*, supra, 215 Conn. 500.

In its determination that the trial court abused its discretion, the majority concludes, in essence, that the trial court reasonably could not have concluded as it did. *Simmons* v. *Simmons*, 244 Conn. 158, 175, 708 A.2d 949 (1998). Put another way, the majority's independent balancing of the private interest factors leads it to conclude that the plaintiffs' chosen forum is unfair and that, essentially, "no jurist of reason would have concluded otherwise . . . ." *Seebeck* v. *State*, 246 Conn. 514, 536, 717 A.2d 1161 (1998). I would conclude that the trial court properly weighed the private interest factors against the plaintiffs' chosen forum and acted within

its reasoned discretion in denying the defendants' motion to dismiss. *State* v. *Wargo*, 255 Conn. 113, 141, 763 A.2d 1 (2000) (when trial court required to balance factors in ruling on discretionary issue "every reasonable presumption should be given in favor of the trial court's ruling" [internal quotation marks omitted]); accord *Lacey* v. *Cessna Aircraft Co.*, 862 F.2d 38, 43 (3d Cir. 1988), on appeal after remand, 932 F.2d 170 (3d Cir. 1991) (appellate court does not "perform a de novo resolution of forum non conveniens issues").

Accordingly, I respectfully dissent.